United States Courts
Southern District of Texas
FILED

DEC 0 4 2024

Nathan Ochsner, Clerk of Court

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

**WILLIAM KENT MCILYAR, Plaintiff**
**Pro Se**

§
**vs.** §
§ CIVIL ACTION NO. 2H - 291
§
**CITY OF CORPUS CHRISTI, TEXAS** §

### PLAINTIFF'S ORIGINAL COMPLAINT

**TO THE HONORABLE UNITED STATES DISTRICT JUDGE:**

**NOW COMES** William Kent McIlyar ("Plaintiff"), hereby filing this, his *Plaintiff's Original Complaint* against his former employer, the City of Corpus Christi, Texas (hereinafter occasionally referred to as "Defendant" or "City"), showing in support thereof as follows:

### I.
### PARTIES

1.    Plaintiff is a male citizen of the United States and a Texas resident, residing in Dallas County, Texas.

2.    Defendant is a political subdivision of the State of Texas. Service of process may be accomplished by serving its Mayor, Paulette M. Guajardo, at 1201 Leopard Street, Corpus Christi, Nueces County, Texas.

### II.
### JURISDICTION, VENUE & CONDITIONS PRECEDENT

1.    Defendant, at all relevant times hereto, was an employer as defined by and within the meaning of the Age Discrimination in Employment Act of 1967 ("ADEA") codified at 29 U.S.C. §621, et seq., Title VII of the Civil Rights Act of 1964, 28 U.S.C. §2000e, et seq. ("Title VII"), the Americans with Disabilities Act of 1990 (hereinafter "ADA"), 42 U.S.C. §12101, 29 U.S.C. §2611 and the Family Medical Leave Act of 1993, 29 U.S.C. §2601, et seq. ("FMLA").

2. Plaintiff timely filed a Notice of Charge of Discrimination with the United States Equal Employment Opportunity Commission (EEOC), charge number 451-2024-04540.

3. On September 5 2024, Plaintiff received a *Determination of Charge and Notice of His Right to Sue* from the EEOC. Plaintiff has therefore complied with all conditions precedent and exhausted all administrative remedies prior to filing suit. Plaintiff timely filed his *Plaintiff's Original Complaint* [D.E. 1] within ninety (90) days of receiving his Dismissal and Notice of Right to Sue letter from the EEOC.

4. Plaintiff brings this action for compensation and other relief for violations under the ADEA, FMLA and Title VII of the Civil Rights Act of 1964 in that Defendant has denied Plaintiff his rights as guaranteed by the Constitution and laws of the United States of America. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question). Venue is proper in the Southern District of Texas, Corpus Christi Division, as this is the district where the claims arose in accordance to 29 U.S.C. § 1391(b).

### III.
### FACTS

5. Whenever, in this complaint it is alleged that any Defendant and/or person employed by Defendant did any act, thing, and/or omission, it is meant that Defendant and/or Defendant's officers, agents, servants, employees, or representatives did such act, thing and/or omission and that at the time it was done with full authorization and/or ratification of Defendant

6. Plaintiff was originally hired by Defendant on or about July 10, 2017, as an Assistant City Attorney, Grade-III. This was the highest Grade Level for an Assistant City Attorney in the City's Legal Department except for the City Attorney and the Deputy City Attorney (formerly referred to as the "Senior Assistant City Attorney"). Plaintiff's position also included supervisory responsibility over the Section in the Legal Department that was responsible for providing legal services to the City's Public Works, Streets, Engineering, Capital projects, land acquisition, Right-of-Way projects,

Housing & Community Development, and claims against City related to capital projects, utility projects, or other construction projects.

7.      On November 17, 2023, without any warning or progressive discipline as was required by the City's Personnel and progressive discipline policies, Plaintiff was handed a Notice of Termination by the City Attorney which was effective immediately and provided no explanation other than the City Attorney had "lost confidence in Plaintiff's ability to perform his duties in a timely manner." Plaintiff asked the City Attorney for more detail as to why he was being discharged on the spot, but the City Attorney refused to speak and walked away.

8.      The City Attorney never offered Plaintiff the chance to resign in lieu of discharge as he had done with many other female and Hispanic Assistant City Attorneys during his 10-12 years managing the City's Legal Department. During the time that Mr. Risley has served as City Attorney for the City of Corpus Christi, he has encouraged and allowed numerous female ACA's and Hispanic ACA to resign their employment in lieu of a disciplinary action, such as termination, suspension, or other serious disciplinary action.

9.      The City Attorney intentionally chose to discharge Plaintiff without warning and without offering Plaintiff the opportunity to resign. The City Attorney fired Plaintiff without any type of warning or progressive discipline as is required by the City's Personnel Policies and other applicable City rules and regulations. The City Attorney spitefully discharged Plaintiff knowing that under City Personnel and Separation Policies that Plaintiff would not be able to cash-in any of his 220+ hours of unused paid sick leave. City policy allows a retiring or resigning employee to cash-in up to 50% of their accrued sick leave; whereas a discharged City employee loses all accrued sick leave hours.

10.     Plaintiff was caught completely unaware by the surprise termination, as he had never received a bad performance evaluation and he had never missed an annual merit raise when the City Manager and City Council had budgeted funds for merit raises to City employees who had received a "meets expectations" or "exceeds expectations" rating on their annual performance evaluation.

11.     Plaintiff had asked been asking the City Attorney for a meeting for more than two months prior to the surprise termination notice. Plaintiff had wanted to discuss a raise in pay to account for all the extra work and special projects that Plaintiff had been handling over the prior year.

12.     Rather than meeting with Plaintiff to discuss Plaintiff's concerns about his increased workload and the lack of a pay raise to account for the increased work load Plaintiff had been carrying since the late spring or early summer of CY2022, the City Attorney instructed his Deputy City Attorney, Joseph Brice to commence an undercover investigation into Plaintiff's working hours during a two-week period in late October into November 2023. The City Attorney also instructed Mr. Brice to contact the Information Technology Department to generate a report of Plaintiff's internet usage during this same two-week period.

13.     Based on information and belief, the City Attorney had never ordered this type of undercover investigation of any of his transactional or litigation attorneys working at City Hall during Plaintiff's six-plus years working for the City to form the basis of a recommendation memorandum to terminate an attorney in the City's Legal Department.

14.     Plaintiff was also shocked by the City Attorney's decision to terminate Plaintiff's employment on November 17, 2023, because the City Attorney knew that Plaintiff had taken on significantly more work and special projects in the prior two years and had not received any promotion or pay raise for taking over some of the work that was previously handled exclusively by the female Senior Assistant Attorney, Lisa Aquilar ("L.A."), when she retired from the City in Fall of 2021 and female ACA Grade III Attorney, Elizabeth Hundley ("E.H.") who still works at the City's Legal Department as of the date of this complaint is filed.

15.     In the Fall of 2021, the City Attorney reassigned some of the work previously handled by Senior Attorney L.A., to Plaintiff without removing any of Plaintiff's other assigned duties and without giving Plaintiff any kind of promotion of raise in pay. In the late spring or summer of 2022, the City Attorney also asked Plaintiff to assist the female ACA Grade III Attorney (E.H.) with her

4

legal work for the City's Aviation Department and the City Airport because she had fallen terribly behind and she was causing delays in various Airport Projects and preventing the projects from moving forward. She was also behind in preparing new and renewed commercial hangar lease and office lease agreements for some of the Airport's tenants or prospective tenants.

16.    The City Attorney did not transfer any of Plaintiff's assigned city departments to E.H. to balance the work load between the two ACA Grade III Attorneys, nor did he promote Plaintiff or raise Plaintiff's pay for taking on the significant additional work.

17.    As early as CY2021-CY2022, the City Attorney had been receiving complaint calls and emails from the City's Airport Management, as well as from the City Manager's Office about the slow work of female Attorney E.H. and her failure to provide the Aviation Department with the legal contracts, lease agreements, and other legal documents required to be included in various Projects that the Aviation Department was putting out for Requests for Proposals and Bid. Attorney E.H. had fallen seriously behind in her work for the Aviation Department even though she had been providing legal services to the Aviation Department for 8-10 years (or longer) at the City. Coincidentally, E.H. had the most Aviation law experience in the Legal Department at the City.

18.    Plaintiff did not have much commercial aviation law experience as he had never been assigned by the City Attorney to provide legal services to the City's Aviation Department. Regardless of this fact, the City Attorney informed the Aviation Department that Plaintiff would now be assisting Attorney E.H. with some of the legal work, but it was understood that E.H. would continue working on the larger projects for the Aviation Department and that Plaintiff would start working on some of the hangar and office lease renewal agreements and small retail lease agreements at the Airport Terminal.

19.    After 2-3 months of Plaintiff assisting Attorney E.H. with her legal work for the City's Aviation Department, the Aviation Department Management and the City Manager's Office saw an improvement in the turnaround time for some of the legal documents needed by the Aviation

Department. However, Aviation Department Management was still concerned that some of the larger Aviation Department projects that had been forwarded to Attorney E.H. many months before Plaintiff was asked to assist, were still outstanding.

20.    Plaintiff assumed that the City Attorney would continue to keep two attorneys assigned to the City Aviation Department until **all the backlog of work was caught up and the newer work for the Aviation Department was getting turned around in proper time frames.** Rather than following this logical approach, the City Attorney approached Plaintiff in the hallway of the Legal Department Offices shortly before Christmas 2022 or shortly after Christmas 2022. He stopped Plaintiff in the hallway as he was passing by and casually informed Plaintiff that he was assigning **100% of all the Aviation Department work to Plaintiff** and he was removing E.H. from all legal work for the Aviation Department. The City Attorney added that the transfer of all Aviation Department work to Plaintiff included the older Aviation Department projects that Attorney E.H. had been sitting on for many months (if not longer) before Plaintiff was first asked to start assisting Attorney E.H. with some of the smaller Airport lease agreements.

21.    Plaintiff immediately asked the City Attorney, which of his other work was being transferred to Attorney E.H. to balance out the workload between the two ACA Grade III attorneys. Mr. Risley simply said "Oh, you will figure out how to manage the extra work" then he turned his back and quickly walked away. Plaintiff realized not long thereafter that the City Attorney had removed approximately 25-30% of Attorney E.H.'s workload and had transferred it exclusively to Plaintiff. The City Attorney did not transfer any of Plaintiff's other city departments to Attorney E.H. to balance the workload between the two ACA Grade III Attorneys. It was very unusual to see the City Attorney remove such a large percentage of one transactional attorney's workload and transfer it to another attorney without balancing out the receiving attorney's workload in some way.

22.    In the following weeks and months, Plaintiff spoke to the City Attorney in person several times informing him that he was overloaded with work, including the transfer of the entire Aviation

6

Department. Plaintiff informed the City Attorney that female attorney E.H. had such a significant backlog of un-started and incomplete work for the City's Aviation Department that Plaintiff did not believe that he could keep up with all his other work, special projects and catch-up all the old Aviation Department work E.H. had never started or completed during the 8-12 years that she was the primary attorney for the City's Aviation Department.

23.    Plaintiff requested that the City Attorney either reassign some of the Airport Projects back to E.H. or that he transfer one of Plaintiff's other assigned city departments to E.H. or to another transactional attorney in the office so that Plaintiff could meet the expedited turnaround time being requested by the City's Aviation Department on all their projects (old and new). The City Attorney just threw up his hands and pretended like there was nothing he could do. This was false, as the City Attorney had at least 6-8 other transactional ACAs at his disposal that he could have brought in to assist with the backlog of work left behind by female attorney E.H.

24.    The City Attorney also had 7-10 other litigation and Municipal Court ACAs that he could have temporarily used to catchup the backlog of work created by female attorney E.H. However, the City Attorney seemed fixated on dumping all of Attorney E.H.'s un-started and/or incomplete legal work for the City Aviation Department on just one attorney, the Plaintiff. The City Attorney was setting up Plaintiff to fail over the next 6-12 months as he knew that he was dumping more work and special projects on Plaintiff than could have been handled by any ACA Grade III attorney in the Legal Department.

25.    During the later part of CY2022 and CY2023, the City Attorney began assigning all kinds of special projects to Plaintiff that had either been started and not completed by other ACA Grade III attorneys in the office or that were unrelated to the City departments that Plaintiff had been assigned to provide legal services. One special project involved a Nation-wide Class-Action lawsuit that had been brought against the manufacturers of foam fire suppressant that had been determined to have a possible link to causing cancer in older and retired firefighters in the United States.

26.     Plaintiff was not a litigation attorney in the City's Legal Department, nor was Plaintiff assigned to provide legal services to the City's Fire Department. Despite having a litigation team and litigation paralegals to handle this type of discovery, the City Attorney instructed Plaintiff to chase down the date, location and type of every fire that had occurred in the City limits within the past 10 years (or something like this time frame).

27.     Plaintiff also informed the City Attorney of all the extra work that was being generated by the City's Ethics Commission and all the extra hand-holding that Plaintiff was doing for the new Chairman of the City's Ethics Commission and for several new appointees to the City's Ethics Commission during the 2022-2023 calendar years.

28.     Plaintiff informed the City Attorney that several new ethics complaints had been filed with the City's Ethics Commission (around the same time that the Aviation Department legal work was transferred 100% from E.H. to Plaintiff) against the City Secretary and against a new City Council Member.  Plaintiff reminded the City Attorney that "all eyes" would be focused on these new ethics complaints filed against these high-profile City officials and that a significant amount of Plaintiff's work hours would be needed to prepare these ethics complaints for review by the City's Ethics Commission.

29.     The City's Ethics Commission is a quasi-judicial body composed of 9 citizens of Corpus Christi who are appointed to serve 3-year terms on the City's Ethics Commission.  Part of their responsibility is to sit to review ethics complaints filed against City Officials and to hold hearings when requested and to make decisions and recommendations regarding the ethics complaint to the City Council.

30.     When a public hearing is convened by the Ethics Commission, the Ethics Commission serves as Quasi-Judicial Body to receive and weigh evidence presented by both the complainant and the City Official/Defendant and to make decisions and recommendations to be presented to the City Council for final action.  As the Ethics Commission is typically composed of resident-citizens with

8

no specialized legal training in the field of City Ethics, the assigned ACA from the City's Legal Department does most of the work to prepare these cases for review by the Ethics Commission.

31.     During the time beginning in the Fall of 2021 through November 17, 2023, Plaintiff was the sole ACA assigned to advise the Ethics Commission and to prepare documents and cases for the City's Ethics Commission.  Plaintiff was also solely responsible for educating and advising the Chairman of the Ethics Commission and other Commission Members on the rules of procedure for conducting a public hearing pertaining to an ethics complaint filed against a City Official.  Plaintiff was also was solely responsible for preparing all decision documents for the City's Ethics Commission and transmitting those documents to the City Council and to all parties involved in the ethics complaint.

32.     Plaintiff never understood why the City Attorney decided to remove his most experienced Aviation law attorney in the office (E.H.) from at least co-working on the legal projects for the City Aviation Department when the City Manager and other City Officials had been pressing the City Aviation Department Director and staff to kickstart new development projects on undeveloped land within the boundaries of the City Airport.

33.     Beginning in CY2021 if not before, and through CY2023, the City Manager and other City Officials had been pressing the City's Aviation Department and staff to develop some of the raw land that lay within the City Airport boundaries for revenue generating projects like a Multi-Pump Gas Station with a large convenience store and possible café. They also urged the Aviation Department to develop a hotel and possible restaurant on undeveloped land within the Airport boundaries.

34.     These potential development projects at the Airport exceeded the normal type of work that E.H. had performed for the Aviation Department in the past and may partly explain why Attorney E.H. had neglected to prepare or complete the legal work for these Projects on a timely basis. On information and belief, Plaintiff believes that Attorney E.H. may have requested that the Airport Director hire a Private Developer or Consultant to guide the City through these proposed private

9

developments on the Airport land. To best of Plaintiff's knowledge, the City Manager did not provide any funding to the City Aviation Department to hire a private consultant to guide the Aviation Department through these proposed private development projects at the City's Airport.

35. Regardless of the motivations of the City Manager and the City Airport Executive staff referenced above, the City Attorney should have never removed his most experienced Aviation law Attorney from the primary position of providing legal advice/counsel to the Aviation Department and generating legal documents to kickstart and move forward new development projects on City Airport property.

36. It was not until approximately February 2023, that Plaintiff first-learned one of the reasons that the City Attorney had decided to transfer all of City Aviation Department's legal work from the most-experienced Aviation Law attorney, E.H. to Plaintiff who had only 6 months of part-time commercial aviation law experience.

37. It was around February 2023, when Plaintiff learned that the City Attorney had granted an especially long vacation request from Attorney E.H. to attend a wedding in Switzerland and to vacation and travel throughout Europe for 5-6 weeks. Plaintiff further believes that the City Attorney knew as far back as sometime in CY2022 that Attorney E.H. was going to request an extraordinarily long leave of absence from work (vacation) in the Spring of 2023, which is why he decided to dump all of E.H.'s old and new Aviation Department Projects on Plaintiff's lap around Christmas of CY2022.

38. Plaintiff further alleges that the City Attorney had a closer personal relationship with female Attorney E.H. than he had with Plaintiff and the City Attorney was hesitant to take disciplinary action against the Attorney E.H. in CY2021 through CY2022 when he was receiving numerous complaints from the City Aviation Department and City Management about Attorney E.H. not getting legal work completed in a timely manner.

39. During Plaintiff's six-plus years of working with the City's Legal Department, no Assistant

10

City Attorney in the Transactional side of the office had ever been granted a vacation request longer than two consecutive work weeks. In fact, it was uncommon for any ACA Grade III or Grade II transactional attorney to take more than 5-7 consecutive "work days" off for vacation. This is because the City Attorney made it clear to all ACA Grade III and II transactional attorneys that he believed that it was very important that the City Departments would never need to contact him about their legal needs because they always had an assigned ACA III or ACA II transactional attorney available to take care of their legal needs.

40.     The City Attorney treated female attorney E.H. and other female attorneys in the City's Legal Department very different than he treated Plaintiff. During the time CY2020 through CY2023, Ms. Hundley was never discharged or demoted from her position as an ACA Grade III even though the City Attorney had received multiple complaints from the City's Aviation Department and the City Manager's Office, both verbally and via email about Attorney E.H. taking too long to generate legal documents for the Aviation Department.

41.     Based on information and belief, the City Attorney never suspended Attorney E.H. or reduced her pay during this time period even though the City Attorney had received multiple complaints about Attorney E.H.'s work performance from the City Aviation Department and the City Manager's Office.

42.     Plaintiff further alleges, on information and belief that the City Attorney gave Attorney E.H. an off-schedule 10% (or larger) raise during the CY2020 through CY2023 time-period. This raise was not a merit raise or cost of living raise that all City employees were eligible to receive. This was a 10% or greater pay raise in addition to any merit raise or cost of living raise given to Attorney E.H. during a particular year in the referenced time-period. This was not a one-time bonus, but a permanent increase in the ongoing annual salary of Attorney E.H.

43.     Based on information and belief, the City Attorney never added back any other city departments to Attorney E.H.'s work load after he transferred all Aviation Department work (old

projects and new projects) to Plaintiff around Christmas 2022. Due to his personal fondness for female attorney E.H. or due to Attorney E.H.'s inability to handle a normal ACA Grade III workload, the City Attorney intentionally reduced the work load of Attorney E.H. as compared to Plaintiff's workload and to the workload of other male ACA Grade III Attorneys around Christmas 2022 through to the filing of this Complaint.

44. There were approximately 13 Assistant City Attorneys ("ACA") working in the civil transactional section and the litigation section at City Hall during Plaintiff's six-plus years working for the City of Corpus Christi. The attorneys working at City Hall were all Grade II or Grade III Assistant City Attorneys (except for the City Attorney and Deputy City Attorney) and they were typically older and possessing more legal experience than the ACA Grade-I Attorneys.

45. During the CY2017-CY2020 period, the Legal Department also employed approximately 2-4 ACA Grade I attorneys who primarily worked as Municipal Court Prosecutors at the Police & Court's Building located at located at 120 N. Chapparal, Corpus Christi, Texas. The Grade I Attorneys were typically hired either right out of law school or they possessed less than 5 years of legal experience.

46. Some of the ACA Grade-I ACAs would eventually gain enough practical legal experience that they could apply for an ACA Grade-II position in the Legal Department at City Hall. There were also many lateral hires from outside the City with significantly more legal experience who were hired by the City Attorney to work directly in either the transactional side or the litigation side of the Legal Department at City Hall. These lateral-hire attorneys would typically be hired in as a Grade II or Grade III Attorney. The Grade II ACA's typically had at least 5-10 years of legal experience and the Level III Attorneys typically possessed 10-35 years of legal experience.

47. Plaintiff possessed 26 years of licensed legal experience in Texas when he was hired by the City to work as an ACA-III attorney with supervisory responsibility over the civil transactional section referenced in this Complaint. Prior to working for the City, Plaintiff had served for nine

years as a City Attorney in a home-rule city in Northeast Texas. Plaintiff has worked in the field of municipal law in Texas for his entire career, including working as a litigator for one of Texas' largest cities for approximately seven years earlier in his career.

48.     The City has a Pay Plan for all City employees, including Assistant City Attorneys that is based on a 100-200-300 Pay Plan. Many of the non-exempt hourly employees that work for the City are 100 pay plan employees. The majority of the ACAs that work for the City are Level 200 exempt salaried employees. The City Attorney and Deputy City Attorney are Level 300 exempt salaried employees.

49.     Within each level of the City's pay plan, there are three columns which reflect the starting pay or minimum pay in the first column, the midpoint pay in the second column and the maximum salary for that particular grade in the third column. (See, copy of the City's Exempt Pay Plan for Level 200 Employees for 2019 attached hereto and incorporated herein as P.E. 1).

50.     During the calendar years 2020 through 2023, the City's pay plan provided that ACA Grade III attorneys could be paid anywhere in the range of $85,416 per year to a high of $139,965 annually. In practice, the City paid all the ACA Grade III attorneys less than the mid-range for their pay grade, which was less than $118,000 annually. Plaintiff's salary ranged from $109,000 to $113,500 annually during the referenced time-period.

51.     The ACA Grade II Attorneys were being paid anywhere from a starting rate of $81,340 per year to a high of $135,000 annually during this time. In practice, most of the ACA II Attorneys were making less than $90,000 per year during the referenced period.

52.     At the beginning of the City's Fiscal Year in FY2019-2020, the ACA Grade I attorneys were being paid a starting salary of approximately $58,000 per year to a top rate of $96,000 per year. In practice, very few ACA Grade I attorneys made more than $60,000 per year during FY2019-2020. For point of reference, the City's Fiscal Year begins on October 1st and ends on September 30th each year. Therefore, FY2019-2020 began on October 1, 2019 and ended on September 30, 2020.

53. At some point or points during the years, CY2021 through CY2023, the City Attorney collaborated with the City Manager, who had final authority over all pay and budgeting decisions for the City's Legal Department, to raise the pay of all the ACA Grade I attorneys in the Legal Department by $20,000 to $25,000 per year by "reclassifying" the ACA Grade I attorneys to Grade II attorneys.

54. This amounted to an approximate raise of 33-41% in annual salary for the youngest and least-experienced group of attorneys in the City's Legal Department. The City did not raise Plaintiff's salary by 33-41% during this time, nor did the City raise the pay of any ACA Grade III attorney by such a staggering amount during those 3 years.

55. This action by the City Attorney and City Manager to increase the annual pay of the ACA Grade I Attorneys ("reclassified" as Grade II Attorneys) by 33-41% in less than three years, without raising Plaintiff's annual salary or the annual salary of any other Grade III Attorney in the Legal Department over the age of 40 by an equal amount during this period was a blatant and intentional violation of the ADEA.

56. The City Attorney and City Manager not only dramatically increased the annual salary of the existing Grade ACA I attorneys already working for the City Legal Department (through "reclassification" to an ACA Grade II) but they also increased the starting salary range and maximum pay range for all future entry level attorneys (now classified as Grade II Attorneys). Again, this was done without raising Plaintiff's annual salary by 33-41% or more during the referenced period. Nor did the City Attorney or City Manager raise the annual salary of any of the other Grade III Attorney over the age of 40 in the Legal Department by 33-41% or more during the referenced period.

57. Plaintiff believes that the City Attorney, the City Manager and the City of Corpus Christi, Texas (through the official acts of the City Attorney and City Manager) intentionally and in bad faith raised the pay of the entry level attorneys by reclassifying the ACA Grade I attorneys as ACA

Grade II attorneys.

58.    More specifically, Plaintiff believes that the City, through the official actions of the City Attorney and the City Manager, intentionally discriminated against him because of his age (60-62 years of age during referenced time-period) by not raising his annual salary by the 33-41% as the City had done for the entry level and younger attorneys. By younger attorneys, Plaintiff is referring to ACA Grade I attorneys who were "reclassified" to ACA Grade II Attorneys during the CY2021 through CY2023 period.

59.    Plaintiff further asserts that the City Attorney discriminated against Plaintiff because of his age and his sex (male) by not allowing Plaintiff to work remotely from the office in the way that the City Attorney allowed female ACAs to work remotely from the office.

60.    On information and belief, the City Attorney has allowed a female attorney Grade III, who is currently the Chief of the City's in-house litigation department to work from home (remotely) 80% or more of all working hours that she works for the City. This fact is well known by most of the ACA's who currently work for the City's Legal Department at City Hall, as well as, by those who have previously worked for the City's Legal Department at City Hall in the last 8-10 years.

61.    It is also well known throughout the City's Legal Department, that the City Attorney has consistently allowed more female ACAs in the Legal Department to work from home (remotely) during normal working hours than male ACA's who work at City Hall.

62.    It is also known that despite the "work from home" or "work remotely" policy that the City Attorney drafted and made effective for the City's Legal Department during the FY2020-FY2023 time period, that the City Attorney did not apply this policy evenly throughout the Legal Department.

63.    During the FY2020-FY2023 period, there were times that Plaintiff would request permission to work from home during the work week, but the City Attorney would deny his request stating that his presence in the office was "essential" to the needs of the City. This principle was not applied evenly throughout the Legal Department, as attendance records and email records will demonstrate,

15

the City Attorney allowed more female attorneys at City Hall to work from home (remotely) more frequently than male ACAs by at least a 2:1 margin during the same time period.

## IV.  FIRST CLAIM FOR RELIEF
## VIOLATIONS OF THE ADEA

64.      Plaintiff re-alleges and incorporates the above paragraphs by reference as if fully set forth herein.

65.      Defendant's actions as described herein constitute unlawful age discrimination in violation of the ADEA.

66.      Throughout the liability period, Defendant has engaged in a pattern and practice of discriminating against individuals who are age 40 and older by knowingly and intentionally, subjecting them to different rules, policies, and procedures related to employment, compensation, working remotely privileges and disciplinary action than similarly situated employees who are under the age of 40.

67.      As a direct and proximate result of Defendant's intentional discrimination, Plaintiff has been denied employment, as well as compensation related to employment and employment benefits with Defendant.

68.      As a result of Defendant's unlawful discrimination, Plaintiff has suffered and expects to suffer pecuniary losses, including but not limited to, lost benefits associated with his employment.

69.      As a result of Defendant's unlawful discrimination, Plaintiff has suffered non-pecuniary losses including, but not limited to, emotional pain, suffering, inconvenience, personal humiliation, mental anguish, loss of enjoyment of life, and other non-pecuniary damages.

70.      Defendant acted at all relevant times with malice and/or reckless indifference to Plaintiff's federally-protected rights. Plaintiff's termination and/or denial of employment constitutes a willful violation of 29 U.S.C. §623.

71.      Additionally, Plaintiff seeks any and all equitable relief necessary to return him to the

position that he would have been in but for Defendant's unlawful discrimination.

## V. SECOND CLAIM FOR RELIEF:
## SEX DISCRIMINATION IN VIOLATION OF TITLE VII
## OF THE CIVIL RIGHTS ACT OF 1964

72.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

73.     By and through his Plaintiff's Original Complaint, Plaintiff asserts that Defendant violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., by discriminating against Plaintiff based on his sex(male), by harassing Plaintiff and by creating a hostile workplace environment in connection with compensation, terms, conditions and/or privileges of employment.

74.     By and through his Plaintiff's Original Complaint and in the alternative, Plaintiff pleads that Defendant inappropriately considered Plaintiff's sex as a motivating and/or substantial factor in subjecting him to different rules, policies, and procedures than similarly situated employees who are not male. As such, Defendant's proffered reasons for disciplining and terminating Plaintiff are pretextual and disguise Defendant's mixed motives of discrimination.

75.     Consequently, Defendant denied Plaintiff equal employment opportunities in that, as a direct and proximate result of the discriminatory employment practices propagated by Defendant, Defendant treated Plaintiff in a disparate manner because of his sex.

76.     Defendant's actions were taken with malice and with reckless indifference to Plaintiff's federally protected rights and Defendant employer is strictly liable for the City Attorney's conduct made unlawful by Title VII.

77.     As a result of Defendant's unlawful discrimination, Plaintiff has suffered and expects to suffer pecuniary losses, including but not limited to, lost wages and other benefits associated with his employment.

78.     As a result of Defendant's discrimination, Plaintiff has suffered non-pecuniary losses including, but not limited to, emotional pain, suffering, inconvenience, personal humiliation, mental anguish, loss of enjoyment of life, and other non-pecuniary damages.

79.     Additionally, Plaintiff seeks any and all equitable relief necessary to return himself to the position that he would have been in but for Defendant's unlawful discrimination.

## VI. THIRD CLAIM FOR RELIEF
## RETALIATION UNDER THE FAMILY MEDICAL LEAVE ACT

80.     Around September 2023, the City Attorney advised Plaintiff that his new supervisor was Joseph Brice, the Deputy City Attorney (formerly the Senior Assistant City Attorney).  In October 2023, Plaintiff sent an email to Mr. Brice ("DCA") requesting approval to take some time off around December 11, 2023 to travel to Dallas, Texas to be with his daughter Emily for the birth of her first child and Plaintiff's first grandchild.

81.     Plaintiff further informed the DCA that he wanted to be there at the hospital in Dallas when his daughter delivered her baby, and that he would like to stay with his daughter for some time after her delivery to help her get back on her feet and get the baby settled in at home. In other words, Plaintiff wanted to provide whatever care or assistance that his daughter might need following the delivery of her first child.

82.     The Deputy City Attorney never responded to Plaintiff's email request for time off in December for the birth of his daughter's first child.  In fact, Plaintiff was still waiting to hear back from the DCA or the City Attorney about his leave request when the City Attorney showed up in Plaintiff's office on November 17 2023 and handed him a Notice of Termination effective immediately.

83.     Plaintiff was an eligible employee under the definitional terms of the Family and Medical Leave Act, 29 U.S.C. §2611(a)(i)(II).

84.     Plaintiff requested leave from his employer, with whom he had been employed for at least twelve (12) months pursuant to the requirements of 29 U.S.C. §2611(2)(i).  Plaintiff also had at least 1,250 hours of service with the Defendant during his last full year of employment.

85.     Defendant is an employer covered under FMLA with fifty (50) or more employees for each

working day during each of the twenty (20) or more calendar work weeks in the current or preceding calendar year, pursuant to 29 U.S.C.A §2611(4)(A)(i). Plaintiff was entitled to receive leave pursuant to 29 U.S.C.A §2612(a)(1) for a total of twelve (12) weeks of leave on an intermittent or block basis.

86. Plaintiff alleges Defendant's unlawful actions in taking an adverse action against him for requesting leave to care for his daughter during and after the birth of her first child, that made him unable to perform the essential functions of his job, violates the Family and Medical Leave Act, justifying an award, *inter alia*, of back pay, front pay, interest, benefits, special damages, expenses, compensatory damages, liquidated damages and punitive damages against Defendant.

87. 29 U.S.C. §2615(a)(2) makes it "unlawful for an employer to discharge or in any other manner discriminate against an individual for opposing any practice made unlawful by this Chapter." 29 U.S.C. §2615(a)(2). To make a *prima facie* showing of retaliation under the FMLA, Plaintiff must show that (1) he was protected under the FMLA; (2) he suffered an adverse employment decision; and either (3a) that he was treated less favorably than an employee who had not requested leave under the FMLA; or (3b) the adverse decision was made because he took FMLA leave. If Plaintiff succeeds in making a *prima facie* case, the burden shifts to Defendant to articulate a legitimate nondiscriminatory or nonretaliatory reason for the employment action(s). *Hunt v. Rapides Healthcare Sys., LLC.,* 277 F.3d 757, 768 (5th Cir. 2001). See also *Chaffin v. John H. Carter Co., Inc.,* 179 F. 3d 316, 320 (5th Cir. 1999); *Bocalbos v. Nat'l W. Life Ins. Co.,* 162 F.3d 379, 383 (5th Cir. 1998).

88. Not long after Plaintiff applied for leave to be with his daughter in Dallas during and after the birth of her first child, the City Attorney had the DCA conduct a sham undercover investigation of Plaintiff's working hours and internet usage at the City for a two-week period in October and then issued a Notice of Termination to Plaintiff which was effective the date of the Notice of Termination, November 17, 2023.

## VII.
## DAMAGES & REQUESTED RELIEF

89.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered and will continue to suffer damages in the form of lost wages, lost future wages, compensatory damages for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other non-pecuniary losses.

90.    Defendant engaged in discrimination, harassment and created a hostile workplace environment in connection with compensation, terms, conditions and/or privileges of employment with malice and/or reckless indifference to Plaintiff's rights. Plaintiff is thus entitled to exemplary damages.

91.    Plaintiff is entitled to recover from the Defendant a reasonable fee for the performance of necessary legal services in the preparation and prosecution of this action in the trial court as well as a reasonable fee for legal services performed on appeal.

92.    As a result of the foregoing unlawful and wrongful acts of Defendant, Plaintiff has been caused to suffer general damages which include but are not limited to the following: both physical and emotional injury, including but not limited to pain and suffering emotional and mental distress, and personal humiliation and shock.

93.    Said injuries have caused Plaintiff to incur special damages.

94.    Plaintiff further prays for all costs and attorney's fees associated with bringing this case to trial.

95.    In addition, Plaintiff prays for punitive damages against Defendant. Punitive damages are designed to punish and deter persons/entities such as Defendant who have engaged in egregious wrongdoing.

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff respectfully prays that this Honorable Court allow him to recover the following:

a.    all direct damages;

b.    consequential and incidental damages, which may include the value of lost income, lost salary income for past and future employment; and whatever else may be proven during the course of litigation;

c.    compensatory and non-compensatory damages, whether general or special, in an amount deemed sufficient by the trier of fact;

d.    an additional sum representing the present value of unaccrued wage payments, front pay, and all other compensation due to Plaintiff for the period following the date of judgment, calculated as of the date of judgment;

e.    an award for past pain and suffering;

f.    an award for future pain and suffering;

g.    an award for past and future mental anguish;

h.    attorney fees in a reasonable amount together with conditional awards in the event of appeal;

i.    court costs, including the costs of litigation;

j.    exemplary damages due to the callous, willful, reckless indifferent, malicious, wanton, grossly negligent and/or intentional conduct or acts of Defendant;

k.    pre-judgment interest and post judgment interest, at the maximum rate as allowed by law; and

l.    any other relief that the Court deems necessary and just.

Respectfully Submitted,

WILLIAM KENT MCILYAR,
PLAINTIFF PRO SE

William Kent McIlyar
Texas Bar No. 13678501
4411 Fairfax Avenue
Dallas, Texas 75205
Email: kentmcilyar@gmail.com
Telephone No. 903-737-8156

**Demand for Jury Trial**

Plaintiff hereby demands trial by jury pursuant to Fed.R.Civ.P. 38(b).