UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| WILLIAM KENT MCILYAR, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 2:24-CV-00291 |
| | § | |
| CITY OF CORPUS CHRISTI, TEXAS, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND RECOMMENDATION

Pending is Defendant's Motion for Summary Judgment in this employment discrimination and retaliation action. (D.E. 42).[1] Plaintiff has responded[2] to which Defendant filed a Reply and Plaintiff has filed a Sur-Reply. (D.E. 54; D.E. 63 and D.E. 69). For the reasons stated below, the undersigned **RECOMMENDS** Defendant's Motion for Summary Judgment be **GRANTED** and this case be dismissed in its entirety. (D.E. 42).

## I.   JURISDICTION

This Court has federal question jurisdiction. 28 U.S.C. § 1331. This case has been referred to the undersigned magistrate judge for case management, including making recommendations on all dispositive motions in accordance with 28 U.S.C. § 636. (D.E. 4).

---

[1]Defendant separately filed exhibits to the Motion for Summary Judgment. (D.E. 43 and D.E. 48).

[2]Plaintiff separately filed exhibits to his Response. (D.E. 55, D.E. 56, D.E. 57 and D.E. 58).

## II.     BACKGROUND

Plaintiff was an Assistant City Attorney, Grade III, for the City of Corpus Christi, Texas.  He worked for the city from July 10, 2017, until he was fired on November 17, 2023.  At the time of his termination, Plaintiff was 62 years old.  Plaintiff alleges he was fired because of his age in violation of the Age Discrimination in Employment Act, and because of his gender in violation of Title VII.  (D.E. 17). Plaintiff further alleges his termination was retaliation for taking leave to care for his daughter in violation of the Family and Medical Leave Act. Defendant alleges there was no discrimination and that Plaintiff was a poor performer who was fired for cause.

Many of the facts in this case are not contested.  For example, the parties agree that throughout 2022, Plaintiff required frequent medical appointments which required him to be away from the office periodically, if not frequently. Therefore, Plaintiff requested an accommodation to his work schedule. On January 28, 2022, Plaintiff's request for alternate in-office hours was granted by city attorney Miles Risley, permitting Plaintiff to work in office from "11 am to 7 pm as an accommodation to frequent doctors' appointments in the mornings." (D.E. 42-1, Page 74).  On March 14, 2022, Plaintiff's request to work alternate in-office hours from 11:30 a.m. to 7:30 p.m. was granted.  (D.E. 42-1, Page 64 and D.E. 43-3, Pages 5-6).

However, the parties do not agree on all facts.  Defendant maintains Plaintiff did not fully comply with the requirements of Plaintiff's alternate schedule.  On February 7, 2023, Risley emailed a "formal letter" to Plaintiff "prompted by [his] lack of

communication with the Ethics Commission Chair, Mr. Fuller.  He has made phone calls and emails to you that you did not respond to within 24 hours.  He has also been frustrated by not having his questions answered completely.  Some of his requests will be demanding to perform.  However, they would not have been made in the first place if you had promptly responded to his communications." (D.E. 42-1, Pages 50-60).

On March 3, 2023, Risley placed Plaintiff on a performance improvement plan ("PIP"), asserting Plaintiff's "substandard performance is probably related to you not putting enough time into your [full-time] job" and directing Plaintiff to email him when he arrived at and left work each day, among other directives, noting he had received complaints regarding Plaintiff's lack of responsiveness.  (D.E. 42-1, Page 22).  In the PIP, Risley noted that while Plaintiff had agreed to and received "an accommodation to deal with frequent doctor's appointments in the morning" with alternate office work hours from 11:30 a.m. to 7:30 p.m. and Plaintiff "agreed to answer [his] cell phone calls in the morning or let me know when this timeline cannot be met," Plaintiff was not in his "office until some time in the afternoon," "often cannot be reached by cell phone or office phone when absent" and "failed to come in by 11:30am, even when I set meetings for that time." (D.E. 42-1, Page 22).[3]  Risley further stated "you often stated that your doctor's appointments ran long.  However, you did not request sick time for these periods." (D.E. 42-1, Page 22).

---

[3]Defendant produced multiple emails between January 2022 and July 2023, where Risley emailed Plaintiff that he had been attempting to contact him or did not see him at scheduled meetings or in his office.  (D.E. 42-1, Pages 37-49).

On April 12, 2023, Plaintiff emailed Risley, in response to Risley's "request for information about my working hours and doctor appointments during recent weeks," that he had worked until 7:30 p.m. "per our flex-time agreement" and frequently worked until 8:15 p.m. or 8:30 p.m. and on one day until 9:30 p.m.  (D.E. 42-1, Page 72).  Plaintiff also stated he had medical ailments, and corresponding medical appointments, so:

> In short, I try to inform you every time if I am running late due to medical reasons.  There are times when I am in the Physical therapy treatment process or chiropractic or electrical stim process where I have had to put my phone away in a locker or other storage area (no phones allowed in the treatment area or when medical staff or present) but I alert you as soon as possible. There are also times that I am in the internal medicine doctor for checkups, illness visits or visits to get a refill called in to the Pharmacy.  Nothing is easy anymore when it comes to medical treatment.  The doctors and therapists all work shorter weeks and hours than they 20 years ago, and they do nothing for free anymore (like calling in a prescription refill).  Every little thing requires a doctor's visit these days.  Please let me know if you have any other questions.  Thank you!

(D.E. 42-1, Page 72).   In his affidavit, Risley avers he "considered terminating [Plaintiff] in April 2023 due to his failure to comply with the [PIP]'s requirements, including complying with his 11:30 a.m. start time, sending emails indicating his arrival and departure times, and working at least 40 hours per week." (D.E. 42-1, Page 9).  He further avers he prepared a memorandum of termination but "decided, however, to hold off, considering the difficulties I had experienced in filling recent vacancies and the need to provide services to the departments assigned to [Plaintiff]." (D.E. 42-1, Pages 9 and 73).[4]

---

[4]In the memorandum, Risley stated, "During the 40-calendar day period after [Plaintiff was placed on a PIP], I received less than 10 emails indicating arrival at or before 11:30 a.m.  I received less than 5 emails indicating the time [Plaintiff] left the office…During that time, I only saw 10 instances of leave usage, only one of which was an all-day leave.  Given his spotty record on

Plaintiff emailed Risley on June 2, 2023, stating, in relevant part:

As we discussed during our meeting this evening beginning at 5:50 pm, I thought we were past the point of me continuing to send you twice-daily emails of when I arrive to the office for "on-site" work and when I leave the office in the evening as you initially requested in early Spring (3/3/2023). To my knowledge, you do not require any other attorney in the City Attorney's Office to email you twice-a-day emails, upon arrival and upon departure. I appreciate that you were able to accommodate my medical needs by allowing me to work a different schedule, but you are doing the same for many other attorneys and staff in this Legal Department and I don't believe you are holding some other attorneys to as strict a standard as you do with me.

As you can understand, as an older attorney, I have more medical issues that are driven in part by 62 years of life and in part by unlucky genetic conditions….

As you know, I rarely if ever request to "Work from Home" as you frequently allow many other attorneys in the office to do without having them email you their start time in the morning and their end of work time in the afternoon. In fact, your written policy for allowing attorneys in this Department to work from home requires that they submit daily timesheets to demonstrate which projects they are working on at home and how many minutes or hours they spend on each task. But you indicated to me this evening that you are not receiving any timesheets from attorneys working from home, which makes me wonder why you have not put these attorneys on PIP plans. As you know, it is only right and fair to enforce CAO rules and policies equally with all attorneys and staff….

Anyway, back to the twice-daily emails you want me to start up again. You have not said anything to me about "on-site office hours" for over 45 days so I assumed that you were happy and that you no longer needed me clogging up your email inbox with "in" and "out" emails. However, today you informed that you want me to continue with the twice-daily emails which I will do.

During our meeting tonight, I expressed to you that I was disappointed and concerned that you feel it necessary to treat one of your most experienced attorneys in the office like a "new attorney" by requiring me to "check-in" and "check-out" with you on a daily basis. I have never been asked to do this with any prior City Legal Department or law firm that represents

---

emailing me upon office arrival, almost non-existent record of emailing me when leaving the office, and his refusal to cc my assistant with emails of his arrival and leaving, I am terminating [Plaintiff's] employment with the City of Corpus Christi, effective at noon tomorrow, on the basis of insubordination and substandard performance." (D.E. 42-1, Page 73).

municipalities in Texas in my 32 years of law practice. But I will do as requested to the best of my ability. But I hope that you will understand those occasional days when I am actually in treatment or with a Physical Therapist, Chiropractor, doctor or nurse and I cannot get to the phone to send an email or to answer a call [from] you. I will call you back as soon as I am released from medical appointment or treatment session and free to use my phone…

(D.E. 42-1, Pages 79-80).

On July 5, 2023, Risley completed Plaintiff's performance evaluation from October 1, 2021, to September 30, 2022, giving Plaintiff an overall rating of "3=Meets Expectations." (D.E. 42-1, Pages 32-33). Risley noted:

Kent has a long history & deep knowledge of municipal law that give him the potential to serve the City as an outstanding attorney. However, to take full advantage of his knowledge, his attendance in the office and reliability in receiving calls when not in the office needs to improve.

(D.E. 42-1, Page 33).[5]

On October 4, 2023, Plaintiff emailed Risley, cc'ing deputy city attorney Buck Brice, requesting to know the status of the PIP, stating, in relevant part:

I need to know from you if I am off that PIP that you started back in March 2023. You have not said anything to me in the last couple of months, so I assume that the PIP is done and over. It also occurred to me that you never informed me if you shared that PIP with anyone besides you and me (and

---

[5]As discussed later in this M & R, Plaintiff's co-workers, Lilia Castro and Elizabeth Hundley, are alleged by Plaintiff to be similarly situated to Plaintiff. On July 3, 2023, Risley also gave Castro an overall rating of "3=Meets Expectations," noting "[e]xcellent motion work. Lilia has become one of the best civil rights litigators in south Texas. Challenges in upcoming year will need to focus on supervisory development and handling personnel issues, including motivating key personnel to increase presence in the office without losing them." (D.E. 42-1, Page 82). The same day, Risley gave Hundley an overall rating of "4=Exceeds Expectations," noting "Elizabeth has taken on a breadth of duties that far exceeds that of most attorneys. She is direct with departments she works with, which can be perceived as a lack of tact. However, she knows the law and tells the truth, which is extremely valuable to the organization." (D.E. 42-1, Pages 84-85). Both Castro and Hundley received an overall rating of "3=Meets Expectations" for the following year from October 1, 2022, to September 30, 2023, from Risley. (D.E. 42-1, Pages 87-88 and 94-95).

6 / 41

possibly Buck)….If you do not value my work and contribution to the City Attorney's Office, then you need to tell me and I will find another job within 6 months (possibly longer if recruitment slows down during the Holidays). But I don't appreciate the gossip that has appeared to have been started in this Legal Department (about me and the PIP) and how it has come back to me from other persons at City Hall. I also don't appreciate being left in the dark about that PIP from 7 months ago. It appears as if you are purposefully leaving me on some type of indefinite PIP which is not the purpose of a PIP per our HR policies. I also don't appreciate being singled-out for indefinite PIP when it appears you allow other attorneys in this office to take EXCESSIVE AMOUNTS of TIME OFF from work with no disciplinary action whatsoever. You also appear to allow other attorneys in the office to stay at home and "work from home" whenever they like when you have told me and other attorneys in the office that you "need" us at the office M-F, 50-52 weeks out of the year. The bottom line is I need to know where I stand with you as my boss and with anyone else up the command chain from you [sic] has other ideas or plans regarding my employment with the [] City Legal Department. I would appreciate a response from you in writing within a couple of days as this has been bothering me for months and I don't think that this is the correct way to treat professional employees that work for you.

(D.E. 42-1, Pages 35-36) (emphasis in original). Risley responded the next day, on October 5, 2023, stating:

Your performance has declined in the past few years. Representatives from several departments have expressed frustration over the slowness of your responses and lack of effective assistance therein. The in-office PIP was an attempt to improve your performance. You have failed to effectively comply with the PIP and have not consistently provided the emails requested therein. In an effort to provide more frequent management input from a manager with a smaller span of control, I have assigned you to Buck [Brice]. Hopefully, he can coach you to a restoration of your productivity and effectiveness. I recommend you take up these issues with him.

(D.E. 42-1, Page 35).

Approximately two weeks later, on October 21, 2023, Plaintiff communicated with Risley stating he had not received a response during the past six months as to whether he

would be getting a raise, stating "you are not paying your most experienced attorney in the office a fair market rate for his experience and skill level <u>despite</u> increasing his workload substantially in the last two years."  (D.E. 42-1, Page 63) (emphasis in original).  Plaintiff further wrote, in relevant part:

> You have adjusted the salaries of many other attorneys in this office by large percentages in the last 12 months, but you seem to forget about me, possibly because of my age or due to the flex work schedule that I work to be able to attend the necessary medical appointments and medical treatments that I have to attend for my health during the 8-5 pm hours when doctor offices and treatment offices are open to patients…You have increased my workload substantially in the 12-24 months while reducing the workload of other [] attorneys in the office.  Most people would expect their Department Head to pay them more in salary when they demand more high-level work from them, but you appear to have ignored this concept.  I need to know what kind of pay raise is coming my way and when I will see it in my paycheck, or I need to move on to a better paying opportunity in the coming year.  I would appreciate your timely response."

(D.E. 42-1, Page 63).[6]

---

[6] In his affidavit, Plaintiff avers the legal work for the City's Aviation Department was fully transferred to him in December 2022 because Elizabeth Hundley "had fallen terribly behind in her legal work" and there had been complaints about the backlog of work.  (D.E. 55, Page 5).  In his Charge of Discrimination, Plaintiff stated: "I had several conversations with Miles Risley throughout 2023 about why he was moving the Airport Legal work from [Hundley] to me while giving her a[n] unscheduled $10,000 raise and giving me nothing but more work to handle.  I also inquired why he would transfer all of the City Airport legal work from the female attorney who had been handling this work exclusively for 15 years to me with very little Airport law work experience."  (D.E. 17-1, Page 1).  Plaintiff also stated he was set up "for future failure [because] I could not possibly catchup all the Airport Project work backlog, the new Airport legal work and all of my pre-existing work without falling behind at some point."  (D.E. 17-1, Page 2).  In his affidavit, Risley avers he modified Plaintif's work assignments to include assisting Hundley with work for the City's Aviation Department because "Hundley was overloaded at the time," given her "especially demanding" work for the City's Finance and Procurement Department and her work with Solid Waste Services, the Aviation Department, the City's Office and Management & Budget as well as the City's auditor and audit committee.  (D.E. 42-1, Page 7).  Risley further avers he "chose [Plaintiff] to provide assistance with the Aviation Department because he appeared to have availability and did not appear to be working full-time hours…[having] missed several meetings [in the first half of 2022] and [being] frequently unavailable when we tried to find or contact him."  (D.E. 42-1, Page 7).

During his deposition, Plaintiff testified he told Risley in May or June of 2023 that his daughter was pregnant with his first grandchild. (D.E. 43-3, Pages 8-9).[7]  Plaintiff testified, "I planned to take some medical leave to be with her at the hospital, support her, care for her in any way I could.  This was going to be – this was her first baby and my first daughter to have her first baby.  It was very important to me.  It was also important to [my daughter]." (D.E. 43-3, Page 9).  Plaintiff also testified it was "hard to say" how long he was planning on being away, "[a]s long as she needed me, I might have been away.  I can't see it being much more than two weeks unless she'd had special needs that required more support or help or care from me." (D.E. 43-3, Page 10).  Plaintiff testified his daughter was not hospitalized prior to the birth, he did not discuss her private medical information with either Risley or Brice and while his daughter was receiving treatment for pregnancy related ailments which he became aware in late November 2023, a complicated childbirth was not anticipated. (D.E. 43-3, Pages 15-16 and 18).

> On November 14, 2023, Plaintiff sent deputy city attorney Brice an email stating:
>
> Just a reminder that I will be taking some leave around [my daughter's] 12/13/2023 due date so that I can support her, and with God's blessing, welcome to the world her first daughter, and my first Grandchild.  I will submit in Kronos for leave, but I cannot until that baby decides when she wants to be born.

---

[7]This portion of Plaintiff's deposition testimony was filed under seal with the Court, presumably because it discussed his daughter's medical treatment. (D.E. 43-3).  The undersigned purposefully does not include the specifics of any treatment in this M & R and therefore, does not file it under seal.

(D.E. 42-5, Page 19).  In his affidavit, Brice avers Plaintiff "sent me that email after Risley had asked me to prepare a recommendation memorandum for [Plaintiff's] termination.  I understood [Plaintiff]'s email to be a statement of his intent to use paid leave that he had accumulated.  The email said that he would submit a request in Kronos for leave.  The regular practice of employees in the City Attorney's Office was to use the City's Kronos personnel-information system to request vacation and personal leave and to request sick leave (whether in advance or upon return).  Upon reviewing payroll records after the filing of this suit, I confirmed that, as of the end of the pay period immediately before the November 14 email, [Plaintiff] had ample hours of leave available to him."  (D.E. 42-5, Page 5).  In his affidavit, Plaintiff asserts, "[p]ursuant to the City's Administrative Policies & Procedures…an employee must give notice of his intent to take family leave to his immediate supervisor or to City Department Head…[who] must in turn direct the employee to the City's Human Resources FMLA Representative to obtain all the necessary forms from the City required to be completed by the employee and reviewed by the HR department to determine eligibility…[including] a medical certificate…filled out by the physician treating the employee or the immediate family member to provide the medical diagnosis related to the FMLA leave request.  To the best of my knowledge, the City's FMLA application forms and medical certificates were not available on Kronos."  (D.E. 55, Page 6).

In a November 17, 2023 memorandum to Risley, Brice recommended Plaintiff's termination "[d]ue to [his] performance issues, attentiveness, problems with punctuality

and accountability, and general attitude," asserting Plaintiff "has not demonstrated the dedication, attitude, or professional demeanor of an attorney in the City Attorney's Office." (D.E. 42-1, Page 19). Expanding on this, Brice stated Plaintiff had "shown no signs of improvement and continues to fail to comply with the PIP," which "directed [him] to spend at least 40 hours assisting his client…fully, enthusiastically, effectively, and competently." (D.E. 42-1, Page 20). Brice further noted "[a] major concern is his lack of performance and accountability," stating the Plaintiff, "based on [his] in/out badge events…is not working a full 40-hour work week" and was, in at least one instance, taking "nearly two months to complete" a task for the Airport Department that "should have taken a week or two at the most." (D.E. 42-1, Pages 20-21). Brice states "[t]his is not the first time the Airport Department has taken issue with his timeliness" and Brice had "also received complaints from various other departments, including Public Works and Neighborhood Service." (D.E. 42-1, Page 21).[8] Brice also stated Plaintiff had recently sent an email to a co-worker, Elizabeth Hundley, "in which the content and tone of the email were found to be unprofessional and lacking the spirit of teamwork that we strive to foster within our organization." (D.E. 42-1, Page 21). In that email, Brice states Plaintiff "attempts to delegate his responsibilities of advising the Airport Department to Elizabeth," after she "assisted him due to his lack of responsiveness to the Airport Department's legal question."

---

[8]There are series of emails in April, June and July 2023 where airport officials expressed concerns about the length of time it was taking the legal department, specifically Plaintiff, from completing requests and responding to e-mails. (D.E. 42-1, Pages 65-68; 70-71 and 103-109).

11 / 41

(D.E. 42-1, Page 21).[9]  Ultimately, Brice "recommend[ed] the termination of [Plaintiff] due to his failure to work 40-hour work weeks, his non-responsiveness to the client's needs, and his lack of team spirit."  (D.E. 42-1, Page 21).  In his affidavit, Risley avers that after reviewing the emails between Hundley and Plaintiff, the "tone and content of [Plaintiff's] response were inappropriate" and "[a]t [that] point, I could not recall the last time that I had seen Plaintiff in the office before the afternoon, but I knew it had been well more than a month" and the investigation report from the Information Technology Department regarding when Plaintiff used his identification badge to enter and exit the office "gave me no reason to believe that [Plaintiff] was coming to work at 11:30 a.m. and working eight hours per day."  (D.E. 42-1, Pages 13 (Affidavit) and 23-27 (Investigation Report dated November 13, 2023)).[10]  Risley then terminated Plaintiff the same day, on November 17,

---

[9]The email, dated November 9, 2023, states:
Elizabeth, Please see this little "junked plane" project all the way through to the end with Tyler as you have become so involved.  I have plenty of other work to do for Airport and my other City Departments.  Thanks, Kent.

Hundley, in her response email the same date states:
Most respectfully, Tyler addressed the initial email from last Thursday (and follow-up inquiry today) to both of us.  I did not answer the initial inquiry to allow you to do so, as Aviation's assigned attorney.  I won't, though, ignore responding to a follow-up request in which I'm being implicated in the delay.  As it stands, please see Tyler's responses at 1:59P and 2:16P.  For the time being this matter has been resolved.  Should Aviation need additional assistance, please see the statutory provisions in Chapters 22 and 683 of the Transportation Code-that's all they need to follow."

(D.E. 42-1, Page 28).

[10]In his affidavit, Plaintiff avers the Investigation Report related to his badge in/out use is flawed because other employees would hold the door open so others could enter or exit the office without swiping their own badges and there was no need to use the badge to exit, among other reasons. (D.E. 55, Page 3).  Plaintiff also avers Brice "hand-picked the few work weeks that he wanted to

2023, stating, "I have lost confidence in your ability to perform your duties in an effective and timely manner." (D.E. 42-1, Page 19).

Plaintiff testified his grandchild was born in December 2023, five days early, by natural birth and after two or three days in the hospital, his daughter returned home. (D.E. 43-3, Pages 10-11). Plaintiff also testified that his son-in-law, his son-in-law's parents and her mother were there to assist her as well. (D.E. 43-3, Pages 10 and 13). Plaintiff filed an EEOC charge on August 29, 2024, alleging age and gender discrimination and FMLA retaliation, receiving a Notice of Right to Sue on September 5, 2024. (D.E. 17-1 and D.E. 17-2). Plaintiff filed this case on December 4, 2024. (D.E. 1). This case has been referred to the undersigned for case management. (D.E. 4).

III.    SUMMARY JUDGMENT STANDARD

Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must examine "whether the evidence presents a sufficient disagreement to require

---

focus on in Plaintiff's 6.5 years of working for Defendant City." (D.E. 55, Page 3). Upon review, the Investigation Report is for the weeks immediately prior to Plaintiff's November 17, 2023, termination, from October 16, 2023, to November 11, 2023. (D.E. 42-1, Pages 23-27). It states during this time, per the badge usage data events, "the employee was observed being at City Hall an average of 5:20 hours" [per day]. (D.E. 42-1, Page 23). There was also information concerning Plaintiff's non-work-related internet activities during this time, including the time he spent reviewing news articles, sports news and scores and stock quotes. (D.E. 42-1, Pages 23-27).

submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251–52.  In making this determination, the Court must consider the record as a whole by reviewing all pleadings, depositions, affidavits, and admissions on file, and drawing all justifiable inferences in favor of the party opposing the motion. *Caboni v. Gen. Motors Corp.*, 278 F.3d 448, 451 (5th Cir. 2002).

The Court may not weigh the evidence or evaluate the credibility of witnesses.  *Id*. Furthermore, "affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed. R. Civ. P. 56; *see also Cormier v. Pennzoil Exploration & Prod. Co.*, 969 F.2d 1559, 1561 (5th Cir. 1992) (Refusing to consider affidavits that relied on hearsay statements); *Martin v. John W. Stone Oil Distrib., Inc.*, 819 F.2d 547, 549 (5th Cir. 1987) (Stating that courts cannot consider hearsay evidence in affidavits and depositions).  Unauthenticated and unverified documents do not constitute proper summary judgment evidence.  *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994). While the Court must not evaluate the credibility of witnesses on a paper record, nor may it weigh the evidence, when considering summary judgment motions prior to a bench trial, the Court "has somewhat greater discretion to consider what weight it will accord the evidence" and "to decide that the same evidence, presented to him…as a trier of fact in a plenary trial, could not possibly lead to a different result." *Jones v. United States*, 936 F.3d 318, 321-22 (5th Cir. 2019) (citations omitted).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The evidence must be evaluated under the summary judgment standard to determine whether the moving party has shown the absence of a genuine issue of material fact. "[T]he substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. If the moving party demonstrates an absence of evidence supporting the nonmoving party's case, then the burden shifts to the nonmoving party to come forward with specific facts showing that a genuine issue for trial does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

To sustain this burden, the nonmoving party cannot rest on the mere allegations of the pleadings. Fed. R. Civ. P. 56; *Anderson*, 477 U.S. at 248. The nonmovant may not rely merely on allegations, denials in a pleading or unsubstantiated assertions that a fact issue exists, but must set forth specific facts showing the existence of a genuine issue of material fact concerning every element of its cause(s) of action. *Morris v. Covan World Wide Moving, Inc.,* 144 F.3d 377, 380 (5th Cir. 1998). "After the nonmovant has been given an opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted." *Caboni*, 278 F.3d at 451.

## IV.    ANALYSIS

### A. DISCRIMINATION CLAIMS

#### 1. STANDARD

"Title VII of the Civil Rights Act of 1964 prohibits employees from 'discriminat[ing] against any individual with respect to employment 'because of such individual's…sex.'" *Olivarez v. T-Mobile USA, Inc.*, 997 F.3d 595, 598 (5th Cir. 2021) (citations omitted).  Similarly, under the ADEA, it is unlawful for an employer to discharge or otherwise discriminate against an employee because of the employee's age.  *See* 29 U.S.C. § 623(a)(1).

To prevail on his claims for age and gender discrimination, Plaintiff may present a case of discriminatory intent by direct or circumstantial evidence, or both.  *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000).  "Direct evidence is evidence that, if believed, proves the fact of discriminatory animus without inference or presumption."  *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897 (5th Cir. 2002) (citation omitted).  "If direct evidence of discrimination exists, no further evidence is required."  *Kelly v. Costco Wholesale Corp.*, 632 F. App'x 779, 782 (5th Cir. 2015) (citation omitted).  However, federal employment discrimination claims under Title VII and the ADEA based only on circumstantial evidence are subject to the burden-shifting framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)."  *Ray v. Columbia Brazoria Indep. Sch. Dist.*, No. 24-20227, 2025 WL 1219191, at *5 (5th Cir. Apr. 28, 2025).

Absent direct evidence, the *McDonnell Douglas* analysis proceeds through three, burden shifting steps.  *Id.*; *Ray v. United Parcel Serv.*, 587 F. App'x 182, 188-89 (5th Cir. 2014).  To establish a prima facie case of discrimination under Title VII, Plaintiff must

16 / 41

show:  (1) he belongs to a protected class; (2) he was qualified for his position; (3) he suffered an adverse employment action; and (4) he was replaced by someone outside the protected class or that other similarly situated persons were treated more favorably.  *Id*. "[W]hether an employee is 'similarly situated' depends on whether that proffered comparator is in 'nearly identical' circumstances." *Harvey v. Lhoist N. America of Tex., LLC*, No. 4:25-cv-291-P, 2026 WL 279877, at *3 (N.D. Tex. Feb. 3, 2026) (citation omitted).  "Two employees have nearly identical circumstances when they 'held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and have essentially comparable violation histories.'" *Id*. (citing *Harville v. City of Houston*, 945 F.3d 870, 875 (5th Cir. 2019)).

Similarly, the standard is the same to establish a prima face case of discrimination under the ADEA, except that Plaintiff must show that he at (4) was either i) replaced by someone outside the protected class, ii) replaced by someone younger, or iii) was otherwise discharged because of his age.  *Long v. City of Llano*, No. 24-50663, 2025 WL 655800, at *3 (5th Cir. Feb. 28, 2025) (citations omitted); *Kean v. Jack Henry & Assoc., Inc.*, 577 F. App'x 342, 349 (5th Cir. 2014) (citing *Jackson v. Cal-W. Packaging Corp.*, 602 F.3d 374, 379 (5th Cir. 2010) (same)).

If Plaintiff successfully establishes a *prima facie* case of discrimination under either Title VII or the ADEA, a presumption of discrimination arises and the burden shifts to the Defendant to articulate a legitimate, nondiscriminatory reason for the employment action taken against the Plaintiff. *Id*. (citation omitted); *Harvey*, 2026 WL 279877, at *3.  The

17 / 41

burden on the employer at this stage is one of production, not persuasion and does not involve a credibility assessment. *Id.* (citation omitted); *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 142 (2000) (citation omitted).

If Defendant satisfies this burden, the burden shifts back to the Plaintiff who must prove "the legitimate reasons offered by the Defendant were not its true reasons, but were a pretext for discrimination." *Id.*; *Crawford v. Formosa Plastics Corp., La.*, 234 F.3d 899, 902 (5th Cir. 2000) (citing *Reeves*, 530 U.S. at 139). "[T]he plaintiff must rebut each nondiscriminatory or nonretaliatory reason articulated by the employer." *Id.*; *Ahmed v. Universal Prot. Serv.*, No. 23-cv-2823, 2025 WL 1148675, at *9 (S.D. Tex. Apr. 18, 2025) (citing *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003)) ("A plaintiff may establish pretext either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence…[meaning] it is not the real reason for the adverse employment action.")

### 2. DISCUSSION

Plaintiff's discrimination claims, based only on circumstantial evidence, are subject to the burden-shifting framework outlined in *McDonnell Douglas*. *Ray*, 2025 WL 1219191, at *5. Defendant first asserts Plaintiff's ADEA and Title VII claims should be dismissed because Plaintiff has failed to establish a *prima facie* case of discrimination under either, focusing on the final step for both claims.[11] More specifically, Defendant

---

[11]There appears to be no dispute that Plaintiff, a male, was 62 years old at the time of his termination on November 17, 2023, and he was qualified for the position as Assistant City

18 / 41

argues Plaintiff has not shown, for his ADEA claim, that he was either i) replaced by someone outside the protected class, ii) replaced by someone younger, or iii) was otherwise discharged because of his age and, for his Title VII claim, that he was replaced by someone outside the protected class or that other similarly situated persons were treated more favorably.  (D.E. 42, Pages 1-12).

In his Response, Plaintiff first asserts his work "was reassigned to 5-6 younger attorneys in the [City's] Legal Department," identifying them by name and year of birth: Janet Whitehead (1974), Trey Youngblood (1977), Buck Brice (1978), Jacqueline Bazan (1975), Adelita Cavada (1979) and Aimee Alcord-Reed (1985).  (D.E. 54, Pages 4-5 and D.E. 56, Page 3).  However, as Defendant argues, "[t]he reallocation of work, which may occur after an employee's departure for any reason, does not permit an inference of discrimination."  (D.E. 42, Page 2) (citing *Ernst v. Methodist Hosp. Sys.*, 1 F.4th 333, 339 (5th Cir. 2021) ("An employee has not been replaced when his former duties are distributed among other co-workers.")  Similar to *Ernst*, Plaintiff's workload was distributed among other employees and therefore, Plaintiff "has not established that he was replaced by someone outside his protected class."  *Id*. (holding Title VII plaintiff could not show he was replaced by former co-workers); *Long v. City of Llano*, No. 24-50663, 2025 WL 655800, at *3 (5th Cir. Feb. 28, 2025) (holding ADEA plaintiff whose position was

---

Attorney Grade III, although the parties dispute the adequacy of his job performance as later discussed in this M & R.

eliminated and whose duties were distributed to younger colleague failed to show he was replaced to someone younger, citing *Ernst*).[12]

Further, Plaintiff is also unable to produce evidence he was otherwise discharged because of his age and/or was treated less favorably than other similarly situated employees outside his protected group. "[F]or employees to be similarly situated those employees' circumstances, including their misconduct, must have been 'nearly identical.'" *Anderton v. Dallas Indep. Sch. Dist.*, No. 3:23-cv-2696-D, 2025 WL 3214783, at *4 (N.D. Tex. Nov. 18, 2025) (citing *Perez v. Tex. Dep't of Crim. Just.*, 395 F.3d 206, 213 (5th Cir. 2004)). While Plaintiff names multiple alleged comparators, Plaintiff has not identified and produced supporting competent summary judgment evidence that any female and/or younger employee whose circumstances were similar to his and who engaged in nearly identical conduct yet was treated more favorably. *Id.*; *Harvey*, 2026 WL 279877, at *3

---

[12]"[A] footnote in *Ernst* suggests that a plaintiff can establish a prima facie case of discrimination by showing that other co-workers among whom the plaintiff's former duties were distributed were all outside of the plaintiff's protected class." *Flettrich v. Chevron Oronite Co., L.L.C.*, No. 23-30093, 2024 WL 962379, * 6 n. 2 (5th Cir. Mar. 6, 2024) (citing *Ernst*, 1 F.4th at 339 n. 5) ("On this record, a factfinder could conclude that all of the co-workers who absorbed Flettrich's former duties were outside of his protected class.") However, here, those co-workers cited by Plaintiff included males and females and all but one were over the age of 40 at the time of Plaintiff's termination. Additionally, Defendant has produced evidence that the new hires after Defendant's termination included two males and one female, born in 1959, 1995 and 1962, respectively. (D.E. 42, Page 3 and D.E. 42-1, Pages 14-15). The undersigned notes Plaintiff contradicts himself by first arguing, related to his age discrimination claim, that his workload was transferred to both male and female attorneys, as discussed above, and later arguing, related to his gender discrimination Title VII, that his workload was transferred only to female attorneys. (D.E. 54, Pages 4-5 and 13-14). However, even while asserting all his primary assignments were transferred to only female attorneys, Plaintiff notes some of his work was transferred to two male attorneys, Buck Brice and Trey Youngblood. (D.E. 54, Page 14). Therefore, it is clear Plaintiff was not replaced by someone outside his protected class.

(citation omitted); *Berquist v. Washington Mut. Bank*, 500 F.3d 344, 353 (5th Cir. 2007) (concluding the same in ADEA context); *Long*, 2025 WL 655800, at *4 (affirming dismissal where plaintiff failed to show "that similarly situated younger employees were treated more favorably than he was.")  Plaintiff argues he was treated less favorably than younger and/or female attorneys because:  (1) he was the only attorney who was told they needed to be in the office, and not working from home, at least 40 hours per week;[13] (2) he

---

[13]As cited by Plaintiff, Risley testified he was still giving Plaintiff work which "would be a positive for [Plaintiff] if [he] was getting his work done properly.  However, it would still mean [Plaintiff] needed to be there 40 hours a week.  If you want to call it face time, call it face time.  But we have an expectation at the City of a 40-hour work week.  Some attorneys do part of their time remotely. However, I have several criteria that's intended to minimize the impact of that remote time and the consequence [sic] inability to measure the available time and maximize the use of that remote time."  (D.E. 56-2, Page 16).

Plaintiff also cites to the declaration of Robert Garcia, a budget analyst in Defendant's legal department, who stated Plaintiff "consistently worked late evening hours in office" and "During the years that I officed across the hall from [Plaintiff] and after I moved to the 3rd Floor at City Hall, I saw [Plaintiff] put in some very long days and nights at the office and I do not believe that he worked from home much at all, and certainly not like many of the female Assistant City Attorneys in the City's Legal Department who 'worked' from home 1-3 days a week on average." (D.E. 56-1, Page 3).  Mr. Garcia further averred "trying to catch Ms. Castro in her office in the Legal Department on the 5th Floor of City Hall is a fool's errand as Ms. Castro is rarely in her office working at City Hall.  When I need to meet with Ms. Castro to discuss a civil lawsuit settlement or civil lawsuit judgment, outside attorney legal bills or court costs to [be] paid by the City, I must schedule a specific meeting date and time with her because she is in the office so infrequently."  (D.E. 56-1, Pages 4-5).  He further opined that "Ms. Castro is working in the office at City Hall less than 25 hours per week on average…rarely finding[ing] her working in her office." (D.E. 56-1, Page 5).  Mr. Garcia also opined Risley favored female attorneys and permitted them to work from home. (D.E. 56-1, Pages 5-7).

Plaintiff also cites, generally, to Risley's declaration as well as his own. (D.E. 54, Page 6).  Risley states Castro was chief of litigation, "effectively supervis[ing] a division within the larger Legal Department," consisting of "four lawyers, two paralegals, and a legal assistant."  (D.E. 42-1, Page 3).  He further averred her assigned "duties require[d] substantial in-person work away from City Hall, including at the police and fire departments and at the internal-affairs office."  (D.E. 42-1, Pages 3-4).  Risley also averred, "Both during and after the pandemic, I also granted [] attorneys' requests to work from home, including a request from [Plaintiff]."  (D.E. 42-1, Page 6 and 46-47).

was the only attorney who had supervisors "conduct[] a secret investigation" related to when he used his magnetic identification badge to enter and leave the office as well as his internet usage;[14] (3) he did not receive an annual performance evaluation and corresponding salary increase for his final year of employment, 2022 to 2023;[15] (4) while he was placed on a Performance Improvement Plan ("PIP") on March 1, 2023 until he was

---

Plaintiff, in his own declaration, states female attorneys were permitted to work from home more frequently and Castro was "working almost entirely from home." (D.E. 55, Pages 3-4). He further averred "Risley also violated his own written Remote Work policy by not requiring the comparator female…attorneys to submit timesheets or time slips to account for all hours and days that they worked remotely." (D.E. 55, Page 6).

[14]Plaintiff cites to Risley's deposition where he stated he had never before requested or looked at the magnetic badge time records of any of his employees in his 12 years as City Attorney for the City of Corpus Christi, except those for Plaintiff. (D.E. 56-2, Page 230). In his Response, Plaintiff states "[t]his fact alone demonstrates with conviction that Risley had a personal vendetta against Plaintiff as he had never gone to such lengths to pull up semi-private employee magnetic identification badge data from the City's Information Technology Department to bolster a weak case for terminating a 6.5-year attorney of the City's Legal Department without warning, without giving Plaintiff an opportunity to resign and without any type of progressive discipline." (D.E. 54-, Page 7).

[15]Plaintiff cites to a City of Corpus Christi's "Administrative Directive:  HR 4.0," specifically Section 3.D(5) (Rules for Pay Plan and Pay Adjustments-Performance Based Merit Increase) which states full and part time employees' performance shall be evaluated yearly, the evaluation period is October 1-September 30 and the "numeric rating may correlate with a percentage of increase." (D.E. 56-3, Page 4). Plaintiff also cites to the deposition testimony of Monica Saenz, the City of Corpus Christi's interim employee relations manager, who testified that while she is "not very familiar with how these annual performance reviews" are handled but it is "up to the discretion of the department director" and full-time city employees are "eligible for annual performance reviews" and "should be getting" a performance review. (D.E. 56-4, Page 12).

Risley testified, again as cited by Plaintiff, that he would have performed Plaintiff's fiscal year 2022-2023 performance review. (D.E. 56-2, Page 13). He further testified, "Under our performance evaluation system, they are only entitled to that performance based increase under that system if I have included them on the overall curve and submitted it to higher management and had higher management approve that." (D.E. 56-2, Pages 10-11).

terminated on November 17, 2023, he did not receive any guidance or feedback from either

Risley or Brice during this time as to how to improve his performance;[16] (5) the magnetic

badge time records for two female and/or younger attorneys, specifically Lilia Castro

(1984)[17] and Elizabeth Hundley (1960),[18] showed they were both working less than 40

hours per week in the office, Ms. Hundley was receiving complaints about her slow pace

---

[16]Saenz, as cited Plaintiff, testified that after an employee is placed on a PIP, "it is recommended that [the supervisor] meet with the employee on a consistent basis to monitor their process or performance during that improvement plan. It would be every week or every other week, depending on what the department head that is giving the performance improvement plan is able to do." (D.E. 56-4, Page 9). Saenz further testified the department head need not report back to her during the PIP plan but should involve her when one was being implemented. (D.E. 56-4, Page 9). Saenz also testified neither Risley nor Brice had consulted her before implementing the March 2023 PIP. (D.E. 56-4, Pages 9-10). Plaintiff asserts he did not received feedback from Risley and when Risley transferred supervision to Brice on October 5, 2023, Brice "did not end the [PIP] that Risley started on or about March 1, 2023 and Brice did not schedule regular meetings with me during those final six weeks." (D.E. 54, Page 10 and D.E. 55, Page 1).

[17]Plaintiff cites to pages of Risley's deposition here but does not attach as an exhibit all those pages nor does he direct the Court to where they are located on the docket and he also generally cites to "(See, Risley Depo.)" without listing specific page citations. (D.E. 54, Pages 11-12). The undersigned conducted a thorough review of all exhibits attached by both parties related to the pending Motion and was unable to locate these pages. However, Plaintiff also cites to a specific deposition exhibit which was included as an exhibit to his Response showing Castro's entries and exits by her badge, totaling significantly less than 40 hours per week in the office from July 2023 to November 2023. (D.E. 58, Pages 2-7).

[18]Again, Plaintiff cites to pages of Risley's deposition here but does not attach as an exhibit all those pages nor does he direct the Court to where they are located on the docket. (D.E. 54, Pages 15-16). However, as with Castro, Plaintiff attaches records showing Hundley's entries and exits by her badge, totaling significantly less than 40 hours per week in the office, again from July 2023 to November 2023. (D.E. 58, Pages 8-13).

The undersigned notes Plaintiff asserts in his declaration that his entry and exit badge data relied upon by Defendant to show Plaintiff's in office hours is unreliable for a variety of reasons, while also arguing in his Response that Castro and Hundley's data should be relied upon to reflect the time they were both working in the office. (D.E. 54, Pages 12-13 and 15 and D.E. 55, Pages 1-3).

of work,[19] neither was placed on a PIP and both received performance evaluations. (D.E. 54, Pages 6-17).[20]

While Plaintiff separately addresses these arguments related to his claims under the ADEA and Title VII, reviewing the available evidence and argument as a whole, the undersigned finds Plaintiff's arguments to be largely inconsistent and not supported by the record. For example, during his deposition, Plaintiff testified Risley had "favorites" in the office and a "special affinity" for certain attorneys, identifying attorneys Lilia Castro, Elizabeth Hundley, Janet Whitehead, Aimee Alcorn, Lisa Aguilar, Buck Brice and Mark DeKoch. (D.E. 42-3, Pages 32-33). As noted by Defendant, this does not support Plaintiff's claims of discrimination by Risley, as both Brice and DeKoch are both male and Hundley (1960) and DeKoch (1953) are both older than Plaintiff and Aguilar (1962) is about the same age. (D.E. 42, Pages 3-4 and D.E. 42-2, Page 4). Additionally, according to Plaintiff's own testimony, both Hundley and DeKoch were permitted to work remotely.

---

[19]Again, Plaintiff cites to pages of Risley's deposition here but does not attach as an exhibit all those pages nor does he direct the Court to where they are located on the docket and he also again generally cites to "See, Risley Depo." (D.E. 54, Pages 16-17). Accordingly, Plaintiff has failed to direct and/or provide the Court with any competent evidence that Hundley received complaints about her slow pace of work. Risley averred, as discussed previously, that "In July 2022, I modified [Plaintiff's] work assignments to include providing Elizabeth Hundley assistance with work for the City's Aviation Department. I did this because Hundley was overloaded at the time," given her other progressively demanding work for other departments. (D.E. 42-1, Page 7). Risley further averred Plaintiff was chosen to provide assistance "because he appeared to have availability and did not appear to be working full-time hours." (D.E. 42-1, Page 7).

[20]In the pending Motion, Defendant addresses additional arguments and comparators Plaintiff has previously or could have possibly raised on this issue. However, the undersigned addresses only those arguments actually asserted by Plaintiff when responding to the pending Motion and recommends any other arguments previously raised by Plaintiff but not specifically asserted in his Response or Sur-Reply to the pending Motion have been abandoned.

(D.E. 42-3, Pages 25-26).  Plaintiff also testified he "never thought Mark DeKoch really had to work that hard.  I think he goofed off a lot…[h]e would go on walks.  Multiple times a day you would see him just walking around City Hall floor to floor…[h]e might spend two hours a day just walking, or an hour and a half to two hours a day because he was doing it multiple times a day."  (D.E. 42-3, Pages 33-34).  Plaintiff also testified DeKoch "chitchatted a lot with" co-workers and Risley and Brice were aware of DeKoch "goofing off large chunks of the day."  (D.E. 42-3, Pages 33-34).  Plaintiff also testified two younger males, Renatto Garcia and Alex Garcia, also routinely worked from home.  (D.E. 42-3, Pages 26-27).  Further, Plaintiff himself was permitted to work from home in February 2022 and Risley emailed him the policy to follow if he requested to work from home in the future.  (D.E. 42-1, Pages 46-47).[21]  Additionally, Plaintiff stated in the email dated June 2, 2023, discussed above, "I rarely if ever request to 'Work from Home' as you frequently allow many other attorneys in the office to do without having them email you their start

---

[21]Plaintiff emailed Risley at 10:54 a.m. on February 3, 2022, stating "I am working from home today…" (D.E. 42-1, Page 47).  Risley replied stating "You can request permission to work from home as follows…" attaching the work from policy which states any request must state a reason and be approved in writing by both the attorney's supervisor and Risley.  (D.E. 42-1, Pages 46-47).  Plaintiff responded "following up on my request to WFH sent earlier today and as we discussed by phone.  My home lost power last night in Portland as the Winter Storm is blowing into the area.  I have had a bit of a cold the last couple of days and did not want to take a cold shower to get dressed for the office.  I did not have any meetings scheduled in the office today and I knew that I could do what needed to be done virtually.  I will be back in the office tomorrow." (D.E. 42-1, Page 46).  Risley replied, "OK.  I am authorizing work from home today so you can deal with your cold.  I will see you tomorrow.  Hopefully, there will not be ice issues in the late morning on the bridge.  If so, please give me another request and expected arrival time."  (D.E. 42-1, Page 46).

time in the morning and their end of work time in the afternoon." (D.E. 42, Page 7 and D.E. 42-1, Page 79).

Plaintiff repeatedly asserts Castro, a younger female, was given preferential treatment. However, Castro was not similarly situated to Plaintiff as she, unlike Plaintiff, was in a supervisory role, supervising four lawyers, two paralegals and a legal assistant and her assigned duties required frequent in-person work away from City Hall. (D.E. 42-1, Pages 3-4). Further, Plaintiff has not presented any competent summary judgment evidence of the attorneys he references in his Response as comparators, or has previously referenced, had comparable violation histories or nearly identical conduct, including similar tardiness issues, missed meetings and complaints about a lack of responsiveness and were treated differently, relative to badge investigation, PIPs or termination. (D.E. 42-1, Pages 7-13, 20-21, 28-30, 33, 35-45, 49, 50, 62, 66-68, 70-71, 72, 79-80 and 103-107).

Further, while Plaintiff argues he did not receive guidance or feedback from Risley from when his PIP began in March 2023 until October 5, 2023, the evidence establishes Risley specifically discussed the PIP with Plaintiff on at least three occasions, in April, June and October 2023. (D.E. 42-1, Pages 9-11, 35-36, 72 and 79-80). Risley further transferred the supervision of Plaintiff's PIP to Brice on October 5, 2023, via email, as discussed above, over a month before Plaintiff was fired, informing Plaintiff he had not complied with the PIP by failing to "consistently provide[] the emails requested therein" and he needed to restore his former "productivity and effectiveness." (D.E. 42-1, Page 35). Defendant also produces competent evidence that Plaintiff was an at-will employee and

26 / 41

therefore, the City's progressive discipline policy did not apply to him.  (D.E. 42-6, Pages 2, 42 and 56).

Additionally, on October 16, 2023, Plaintiff's performance rating for 2022-2023 was submitted for review to human resources via a spreadsheet of all employees, it was approved and returned on December 20, 2023, and Risley was advised that written "Performance Evaluations should be completed by January 12, 2024."  (D.E. 42-1, Pages 17-18; D.E. 42-4, Page 7; D.E. 56-7; and D.E. 63-5, Pages 3-9).  On the spreadsheet, Plaintiff received a "2-Needs improvement" from Brice as did a younger (1985), female attorney.  (D.E. 42-2, Page 4 and D.E. 63-5, Page 10).  Plaintiff was terminated prior to this time and therefore, did not receive a written performance evaluation.  However, the other attorney who received a "2" received her written performance evaluation on March 5, 2024.  (D.E. 42-1, Page 92).[22]  Hundley and Castro received their written performance evaluations on January 2, 2024, with overall evaluations of "3=Meets Expectations."  (D.E. 42-1, Pages 87-89 and 94-96).[23]

---

[22]It was noted in her evaluation that she "was not a self-starter or proactive in working on assigned cases.  In addition, the employee was not familiar with some of the federal court deadlines and did not take the initiative to look up the rules and ensure that answer dates or response dates were properly calendared."  (D.E. 42-1, Page 93).  Noting her Division reassignment, it was noted "I am hopeful that employee can be timelier in the completion of assigned tasks and more knowledgeable" in the relevant areas of law.  (D.E. 42-1, Page 92).

[23]DeKoch received a "3" rating from Castro.  (D.E. 63-5, Page 10).

In short, Plaintiff does not provide any facts showing any persons of any age or gender were engaged in "nearly identical conduct" and were treated differently. *Thompson v. Midland Coll.*, 734 F.Supp.3d 601, 606 (W.D. Tex. 2024). "Plaintiff ha[s] to provide evidence showing "that the misconduct for which [he] was discharged was nearly identical to that engaged in by other employees." *Id.* (citation omitted). However, Plaintiff has not done so and therefore, he has failed to establish a *prima facie* case of discrimination. "Unsupported and vague allegations concerning similarly situated employees are not enough to defeat summary judgment." *Long*, 2025 WL 655800, at *4 (citation omitted).

Although it is not necessary for the Court to proceed to the next step in the *McDonnell Douglas* framework, the undersigned further recommends Plaintiff's claims fail even if the Court assumes he is able to establish a *prima facie* case of either gender or age discrimination. *Jenkins v. City of Dallas*, 717 F.Supp.3d 528, 538 (N.D. Tex. 2024) (citation omitted) ("[W]hether the City had a legitimate, nondiscriminatory reason" for the adverse action "is not pertinent until the summary judgment stage, and even then, only *after* a plaintiff establishes his *prima facie* case.") (emphasis in original). The burden would shift to Defendant to articulate a legitimate, nondiscriminatory reason for Plaintiff's termination. Defendant has met this burden by producing evidence that Plaintiff was terminated because he did not work sufficient hours, he was not responsive to client needs in a timely manner, he lacked productivity, he lacked team spirit and had "demonstrated an unwillingness to perform, produce and be a team player" and, overall, Risley "lost

confidence in [his] ability to perform [his] duties in an effective and timely manner." (D.E. 42, Pages 14-42-1, Pages 13 and 19-21).

Having met the burden of production, the burden shifts back to Plaintiff to produce evidence rebutting each of Defendant's proffered reasons. *Crawford*, 234 F.3d at 902 (citation omitted); *Ahmed*, 2025 WL 1148675, at *9 (citation omitted). Plaintiff does not separately address, in either his Response or in his Sur-Reply, Defendant's argument that the reasons for his termination were not pretextual. (D.E. 42, Pages 12-22; D.E. 54; D.E. 63, Page 8; and D.E. 69). Giving full credence to Plaintiff's summary judgment evidence, Plaintiff does not establish Defendant's proffered reasons were mere pretext or that there is a genuine issue of material fact. Plaintiff's subjective beliefs that the motivation for his termination was his age and gender are unavailing as summary judgment evidence. *Celotex*, 477 U.S. at 325; *See Vasquez v. Nueces Cnty.*, 551 F. App'x 91, 94 (5th Cir. 2013) (citation omitted). "When evaluating a defendant's explanation, '[t]he question is not whether an employer made an erroneous decision; it is whether the decision was made with discriminatory motive." *Rodriguez v. City of Corpus Christi*, 129 F.4th 890, 900 (5th Cir. 2025) (citation omitted). "[E]ven an incorrect belief that an employee's performance is inadequate constitutes a legitimate, non-discriminatory reason. Indeed, 'a dispute in the evidence concerning…job performance does not provide a sufficient basis for a reasonable factfinder to infer that [the] proffered justification is unworthy of credence.'" *Id.* (Finding no error with the district court's determination that a plaintiff did not establish pretext by "merely disput[ing] the evidence concerning job performance.") (citation omitted).

Overall, the entire months long process resulting in Plaintiff's termination was extensive, involving both Risley and Brice who considered all material information. While Plaintiff does not agree with the method or the conclusion of the process, including the PIP and badge entry/exit investigation, Plaintiff has not shown Risley or Brice acted with any discriminatory motive. Rather, the record shows the decision to terminate Plaintiff's employment was based on a reasonable belief that Plaintiff was not adequately performing his job, even after being repeatedly and formally warned.

As a final note, as discussed by Defendant, Plaintiff was already subject to both Title VII and ADEA protection when he was hired by Risley in 2017 and Risley is in both of Plaintiff's protected classes, as a male born in 1967. (D.E. 42, Page 13 and D.E. 42-2, Page 4); *White v. Omega Protein Corp.*, 226 F. App'x 360, 362 (5th Cir. 2007) ("When the same person is reasonable for hiring and terminating an individual, who is already a member of the [ADEA]-protected class when hired, there is an inference that age was *not* the reason for the termination…From the standpoint of the putative discriminator, [i]t hardly makes sense to hire workers from a group one dislikes…only to fire them once they are on the job. Moreover, the fact that the actor involved in both employment decisions is also a member of the protected class only enhances the inference.") (emphasis in the original and citations and internal quotations omitted); *Kobaisy v. Univ. of Miss.*, 624 F. App'x 195, 199 (5th Cir. 2015) (affirming summary judgment and noting the district court correctly applied same-actor inference for a Title VII claim).

For the reasons stated above, the undersigned recommends there is no issue of material fact that Plaintiff has failed to establish a *prima facie* case of discrimination and that Defendant's proffered reasons for terminating Plaintiff's employment were pretext. Therefore, the undersigned recommends summary judgment is appropriate for Plaintiff's claims under both the ADEA and Title VII.

**B.　FMLA**

**1.　STANDARD**

The FMLA was enacted "to entitle employees to take reasonable leave for medical reasons, for the birth or adoption of a child, and for the care of a child, spouse, or parent who has a serious health condition" and "protects employees from retaliation or discrimination for exercising their rights under the FMLA." 29 U.S.C. § 2601(b)(2). To establish a *prima facie* case of FMLA retaliation, Plaintiff must show he: (1) was protected under the FMLA; (2) suffered an adverse employment action; and (3)(a) was treated less favorably than a similarly situated employee who had not requested leave or (b) the adverse decision was made because he took FMLA leave. *Acker v. Gen. Motors, LLC*, 853 F.3d 784, 790 (5th Cir. 2017) (citation omitted). "The third element requires the employee to show 'there is a causal link' between the FMLA-protected activity and the adverse action." *Id*. at 790 (citation omitted). Further, once a plaintiff makes this preliminary showing, the employer must articulate a legitimate, nondiscriminatory reason for the plaintiff's termination. *Richardson v. Monitronics Intern, Inc.*, 434 F.3d 327, 332 (5th Cir. 2005) ("If the employer succeeds in doing so, the burden shifts back to the employee to show by a

31 / 41

preponderance of the evidence that the employer's articulated reason is a pretext for discrimination.") (referencing the *McDonnell-Douglas* burden shifting framework).

## 2. DISCUSSION

Plaintiff brings this retaliation claim alleging he was terminated from his employment on November 17, 2023, after requesting leave to care for his daughter when she was scheduled to give birth in December 2023.  As discussed above, Plaintiff testified he told Risley in May or June of 2023 that his daughter was pregnant with his first grandchild.  (D.E. 43-3, Pages 8-9).  Plaintiff also testified that his daughter was not hospitalized prior to the birth, he did not discuss her private medical information with either Risley or Brice and while his daughter was receiving treatment for pregnancy related ailments which he became aware of in late November 2023, a complicated childbirth was not anticipated.  (D.E. 43-3, Pages 15-16 and 18).  On November 14, 2023, three days prior to his termination, Plaintiff sent Brice an email stating:

> Just a reminder that I will be taking some leave around [my daughter's] 12/13/2023 due date so that I can support her, and with God's blessing, welcome to the world her first daughter, and my first Grandchild.  I will submit in Kronos for leave, but I cannot until that baby decides when she wants to be born.

(D.E. 42-5, Page 19).  Plaintiff testified his grandchild was born in December 2023, five days early, by natural birth and after two or three days in the hospital, his daughter returned home.  (D.E. 43-3, Pages 10-11).  Plaintiff also testified that his son-in-law, his son-in-law's parents and her mother were there to assist her as well.  (D.E. 43-3, Pages 10 and 13).

Defendant first argues Plaintiff is not entitled to FMLA protection as the birth of a grandchild is not a qualifying reason for FMLA leave under the facts in this case, citing to the statute asserting "an adult child is an FMLA-qualifying 'son or daughter' only if the child is 'incapable of self-care because of a mental or physical disability'" and to an Eleventh Circuit case which found that assisting an adult daughter with the birth of a grandchild is "a condition which the FMLA does not cover." *Cruz v. Publix Super Mkts., Inc.*, 428 F.3d 1379, 1386 (11th Cir. 2005); (D.E. 42, Pages 22-23). Defendant also asserts Plaintiff did not provide sufficient notice of the need to take FMLA leave. (D.E. 42, Pages 23-24); *Willis v. Coca Cola Enter. Inc.*, 445 F.3d 413, 417-19 (5th Cir. 2006) (Finding while it is the employer's responsibility to designate leave as FMLA qualifying, the employee must explain the reasons for the needed leave and "[t]his sharing of informational burden will not work if employees, for the purposes of litigation, can later designate leave as FMLA-qualifying without making a proper showing that, at the time they requested leave, they put their employer on notice that FMLA leave was necessary due to a serious medical condition.") Defendant further asserts there is no causal link between any protected activity and Plaintiff's termination because Brice was asked to prepare the memorandum recommending Plaintiff's termination the morning of November 14, 2023, after the badge in/out report was requested and received, and Plaintiff sent the email stating he was taking leave for the birth of his granddaughter, which is what Plaintiff alleges to be his protected FMLA activity, at 5:40 p.m. that night. (D.E. 42, Page 24; D.E. 42-5, Pages 4-5, 11, 19 and 25; D.E. 54, Pages 19-20 and D.E. 63, Page 9). Lastly, Defendant asserts

that, similar to his discrimination claims, Plaintiff has failed to produce sufficient evidence that Defendant's reasons for his termination are pretextual. (D.E. 42, Page 24); *Cerda v. Blue Cube Operations LLC*, 95 F.4th 996, 1002-03 (5th Cir. 2024) (Finding Plaintiff's FMLA retaliation claim was "evaluated under a version of the *McDonnell Douglas* burden-shifting framework" and was "properly dismissed because she did not identify a genuine dispute of material fact with respect to the issue of pretext…which can be proven by an evidence that casts doubt on the credence of the employer's proffered justification for the adverse employment action.")

In Response,[24] Plaintiff claims his email to Brice on November 14, 2023 "was more than enough under the City's FMLA Policy and Procedures to have required Mr. Brice to alert Mr. Risley of his receipt of Plaintiff's notice to take family leave the following month and to provide Plaintiff with a copy of the City's FMLA leave application forms and medical certification." (D.E. 54, Pages 17-18). Further, Plaintiff argues Risley "does not have a medical degree, he is not a licensed medical doctor in the State of Texas" and "[h]e is not designated by the City's FMLA Policies and Procedures to determine whether Plaintiff's daughter's pregnancy is a serious physical or mental condition." (D.E. 54, Page 19). Plaintiff also argues Risley had been planning to terminate him as far back as April 2023 and, without citing to any evidence, the "last thing that Risley wanted to see was Plaintiff be able to use some of his accrued paid sick leave." (D.E. 54, Page 19). Plaintiff

---

[24]Plaintiff, in this section of his Response, repeatedly leaves his referenced exhibits blank: "Exh.___)." (D.E. 54, Pages 17-19).

further asserts, again without citation to any evidence, that "Risley and Brice thought that if they just terminated Plaintiff quickly enough, 3 days following Plaintiff delivering his Nov. 14th email notice of intent to take family leave to be with his pregnant daughter during and after her delivery of her first baby, that maybe Plaintiff's timely and appropriate requested for family leave would be forgotten." (D.E. 54, Pages 19-20).

On its face, the FMLA does not allow grandparents to take protected leave related to the birth of a grandchild, but it does cover leave to care for a child with a serious health condition. A child is defined as a person "under 18 years of age; or 18 years of age or older incapable of self-care because of mental or physical disability." 29 U.S.C. § 2611(12)(A)-(B). Further, the statute defines a "serious health condition" to mean "an illness, injury, impairment, or physical or mental condition that involves" either "inpatient care in a hospital, hospice, or residential medical care facility; or continuing treatment by a health care provider." 29 U.S.C. § 2611(11). Pregnancy of an adult child alone is often not considered a serious medical condition. *Jordan v. Tex. Dept. of Aging and Disability Servs.*, No. 9:05-cv-161, 2006 WL 1804619, at * 6 (E.D. Tex. June 28, 2006). However, "it is obvious that in some cases a pregnancy can be a serious medical condition," especially where extra medical care is required. *Id*. (Finding, at summary judgment, that there was a genuine issue of material fact as to whether Plaintiff's teenage daughter had a serious medical condition when she was admitted to the hospital for inpatient care under the continuing treatment of a health care provider for several days prior to and after giving birth); *Cruz*, 428 F.3d at 1383 (FMLA protection could extend to an employee taking leave

35 / 41

to care of his adult child if the child is incapacitated due to pregnancy and therefore, to apply, "Cruz must prove that her daughter was experiencing something beyond a normal pregnancy").

Here, there is no summary judgment evidence, medical records or otherwise, that Plaintiff's daughter was incapable of self-care because of a mental or physical disability either before or after the natural birth of her child. *Voyles v. Lane Furniture Indus.*, No. 1:08-cv-55, 2009 WL 2392142, at *3-4 (N.D. Miss. July 31, 2009) (Finding Plaintiff was not entitled to FMLA leave where she failed to prove her adult daughter was incapable of self-care due to a physical disability following her discharge from the hospital after giving birth to a normal but premature child) (citations omitted); *Cruz*, 428 F.3d at 1381, 1384-86) (Affirming summary judgment on FMLA retaliation and interference claims where plaintiff was terminated after she was denied additional leave to assist her adult daughter during labor where her son-in-law had a broken collarbone, supported by a letter from her daughter's physician confirming the son-in-law's ailment, that he "is now unable to help with labor coaching," and her daughter "feels she needs her mother to come help with labor etc., as she has no one else to help.")[25]  "[T]he protections of the FMLA do not extend

---

[25] Plaintiff argues, for the first time in his Sur-Reply, that whether he was legally entitled to FMLA is "legally irrelevant" because he attempted to engage in protected activity by requesting FMLA and "[t]he FMLA protects employees who attempt to exercise FMLA rights."  (D.E. 69, Page 1-2).  Plaintiff conclusory asserts this argument is in response to "Defendant's Reply [which] introduces new legal theories and factual assertions that were not [previously] presented."  (D.E. 69, Page 1).  The undersigned finds Plaintiff's new arguments raised for the first time in his Sur-Reply are an improper attempt to assert what should have been previously raised in his Response to Defendant's Motion, which clearly asserts that Plaintiff did not establish he was entitled to FMLA leave or provide sufficient notice.  *Toccoa, Ltd. V. N. American Roofing Serv., LLC*, No. 1:21-cv-313, 2023 WL 4106440, at *4 (E.D. Tex. June 21, 2023) (It is well established in the Fifth

to an employee taking leave to care for his or her adult child simply because that child is pregnant, unless, for example, that child is incapacitated due to the pregnancy." *Id.* at 1383. Accordingly, the undersigned recommends Plaintiff's claim fails.

Further, the undersigned recommends Plaintiff also failed to provide sufficient notice to Defendant of his intent to take FMLA leave. "Although an employee need not use the phrase 'FMLA leave,' she must give notice that is sufficient to reasonably apprise her employer that her request to take time off could fall under the FMLA." *Lanier v. Univ. of Texas Southwestern Med. Ctr.*, 527 F. App'x 312, 316 (5th Cir. 2013). The Fifth Circuit "does not apply categorical rules for the content of the notice" and instead focuses on what is "'practicable' based on the facts and circumstances of each individual." *Id.* (citing *Manuel v. Westlake Polymers Corp.*, 66 F.3d 758, 762-64 (5th Cir. 1995)); *see also* 29 C.F.R. § 825.302(b). "The employer is not required to be clairvoyant," but "may have a duty to inquire further if statements made by the employee warrant it." *Id.* (citing *Satterfield v. Wal-Mart Stores, Inc.*, 135 F.3d 973, 980 (5th Cir. 1998)); 29 U.S.C. § 825.302(c) ("In all cases, the employer should inquire further of the employee if it is necessary to have more information about whether FMLA leave is being sought by the employee and obtain the necessary details of the leave to be taken. In the case of medical conditions, the employer may find it necessary to inquire further to determine if the leave

---

Circuit that arguments raised for the first time in a reply and sur-reply are waived) (Listing cases). Therefore, the undersigned declines to address this argument further here.

37 / 41

is because of a serious health condition and may request medical certification to support the need for such leave.")  Plaintiff testified he did not discuss his daughter's medical information with either Risley and Brice and a complicated childbirth was not anticipated. (D.E. 43-3, Pages 15-16 and 18).  Further, Plaintiff did not specifically reference the FMLA in his November 14, 2023, email requesting leave for the birth of his first grandchild and nothing in the email alerts Risley or Brice that it would be anything other than a normal birth of a grandchild, which it ultimately was, not requiring any pre-delivery hospitalization and a release to home within two to three days after the natural birth.  (D.E. 42-5, Page 19 and D.E. 43-3, Pages 15-16 and 18).[26]  Plaintiff states in the email that he would submit a request in Kronos for leave, which he now avers "[t]o the best of my knowledge, the City's FMLA application forms and medical certificates were not available on Kronos."  (D.E. 42-5, Page 19 and D.E. 55, Page 6).  Nor does Plaintiff produce any evidence that he ever requested information from either Brice or Risley about FMLA leave or required forms prior to his termination.  In contrast, Brice avers he "understood [Plaintiff]'s email to be a statement of his intent to use paid leave that he had accumulated" of which he had ample available.  (D.E. 55, Page 6).  Therefore, Plaintiff provided neither Risley nor Brice who, as noted by Plaintiff are experienced attorneys with a "combined 45+ years" of experience,

---

[26]Plaintiff testified his daughter's "birth plan was a normal, natural birth."  (D.E. 43-3, Page 16). Plaintiff testified he learned in late November 2023, about eight days before the birth, that his daughter had some swelling in her ankles and calves which required her to "[k]eep her legs elevated more often" and "I think she got anemic at some point during the last term of her pregnancy, and they had to put her on some medication for being anemic."  (D.E. 43-3, Page 16). Again, Plaintiff directs the Court to no evidence, nor does he argue, that his daughter was incapable of self-care before or after the birth.

with any information which would require them to inquire further as, for reasons discussed above, the FMLA does not allow grandparents to take protected leave related to the birth of a grandchild.  (D.E. 54, Page 20).  Risley and Brice "had no indication from [Plaintiff's] communications that [his] daughter was experiencing anything other than a normal pregnancy [and] [t]herefore, [Plaintiff] did not notify [them] of any condition that could potentially qualify [him] for FMLA leave at the time of [his] request or before [his] request."  *Cruz*, 428 F.3d. at 1385.  As argued by Defendant, the evidence establishes Plaintiff, for the purposes of litigation, is seeking to designate his request as FMLA-qualifying without making a proper showing that, at the time he requested leave, he put Defendant on notice that FMLA leave was necessary due to a qualifying condition.  *Willis,* 445 F.3d at 417-19.

Lastly, even if Plaintiff had established a *prima facie* case of FMLA retaliation,[27] as discussed above related to Plaintiff's discrimination claims, Defendant has articulated

---

[27]As the undersigned recommends Plaintiff has not established he engaged in protected FMLA activity under the first prong of the required analysis, the undersigned need not address the third prong, a "causal link" as discussed above, in detail.  However, the undersigned does note that while there is a temporal proximity between Plaintiff's November 14, 2023, email and his subsequent termination three days later, Plaintiff has not directed the Court to any other evidence establishing a causal link between the email containing Plaintiff's leave request and his termination.  *Swanson v. Gen. Serv. Admin.*, 110 F.3d 1180, 1188 (5th Cir. 1997) (citation omitted) (The Fifth Circuit has held that five days between the employee's protected activity and subsequent termination may be sufficient on its own to establish a causal connection.)  In contrast, the evidence does show the decision to terminate Plaintiff was being considered well before his email and even before he initially discussed with Risley his daughter being pregnant in May or June 2023.  Included in the evidence is an April 2023 termination memorandum drafted by Risley.  It also appears the ultimate decision to terminate Plaintiff was made the morning of November 14, 2023, although the undersigned makes no finding or recommendation on this issue.  Additionally, as discussed later in this M & R, Plaintiff has not established pretext.  *Id*.  (While "close timing" may be sufficient to establish causal connection, "once the employer offers a legitimate, nondiscriminatory reason

39 / 41

legitimate, nondiscriminatory reasons for Plaintiff's termination and Plaintiff does not establish Defendant's proffered reasons were mere pretext or that there is a genuine issue of material fact. *Richardson*, 434 F.3d at 332 (5th Cir. 2005); *Cerda*, 95 F.4th at 1002-03. Again, the record shows the decision to terminate Plaintiff's employment was based on a reasonable belief that Plaintiff was not adequately performing his job, even after being repeatedly and formally warned.

For the reasons stated above, the undersigned recommends there is no issue of material fact that Plaintiff has failed to establish a *prima facie* case of retaliation and that Defendant's proffered reasons for terminating Plaintiff's employment were pretext. Therefore, the undersigned recommends summary judgment is appropriate for Plaintiff's claim under FMLA.

## V.   RECOMMENDATION

For the reasons stated above, the undersigned **RECOMMENDS** Defendant's Motion for Summary Judgment be **GRANTED** and this case be dismissed in its entirety. (D.E. 42).

ORDERED on May 26, 2026.

Jason B. Libby
United States Magistrate Judge

---

that explains both the adverse action and the timing, the plaintiff must offer some evidence from which the jury may infer that retaliation was the real motive.")

40 / 41

NOTICE TO PARTIES

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within **FOURTEEN (14) DAYS** after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to 28 U.S.C. § 636(b)(1)(c); Rule 72(b) of the Federal Rules of Civil Procedure; and Article IV, General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendations in a Magistrate Judge's report and recommendation within **FOURTEEN (14) DAYS** after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court.  *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415 (5th Cir. 1996) (en banc).